In the Matter of GLENWOOD TV, INC., Respondent, v BRUCE C. RATNER, as Commissioner of the Department of Consumer Affairs of the City of New York, Appellant. (Action No. 1.)

In the Matter of CHARLES TV, INC., Respondent, v BRUCE C. RATNER, as Commissioner of the Department of Consumer Affairs of the City of New York, Appellant. (Action No. 2.)

Second Department, September 17, 1984

APPEARANCES OF COUNSEL

*Frederick A. O. Schwarz, Jr., Corporation Counsel* (*Leonard Koerner* and *David Drueding* of counsel), for appellant.

*Meissner, Tisch & Kleinberg* (*Ronald M. Kleinberg, Laurel J. Weinberg* and *Gino Josh Singer* of counsel), for respondents.

OPINION OF THE COURT

Titone, J. P.

■ The Commissioner of the New York City Department of Consumer Affairs appeals from two judgments of the Supreme Court, Kings County, which declared subdivision 5 of section B32-472.0 and section 773-13.0 of the Administrative Code of the City of New York unconstitutional insofar as they purport to authorize nonconsensual periodic inspections of the records of licensed television and radio repair businesses without a search warrant, and annulled determinations suspending the petitioners' licenses and imposing fines for a willful refusal to permit such inspections.[1] A majority of this court finds the legislation to be constitutional and, therefore, reverses the two judgments.

I

In 1973, the New York City Council enacted New York City Local Law No. 74 of 1973 (Administrative Code, ch 32, tit B, art 44, § B32-465.0 *et seq.*), which provides for the licensing and regulation of individuals and entities engaged in servicing or repairing television, radio or audio equipment. The City Council, which had studied the matter for several years (see *Metropolitan Electronic Tel. Serv. Dealers Assn. v Guggenheimer,* NYLJ, July 2, 1975, p 12, col 5, affd 51 AD2d 922, mot for lv to app den 39 NY2d 709), concluded that the business had "become the subject of great abuse. The public has been and is unprotected from unethical and financially unstable service dealers. The necessity for legislative intervention to protect the public and legitimate service dealers [was] * * * declared as a

---

1. Special Term's opinion also purported to require that the Department of Consumer Affairs give licensees advance written notice of at least one week of any inspection, and the opportunity to reschedule inspections at more convenient times. The signed judgments, however, omit these requirements.

matter of legislative determination" (Administrative Code, § B32-465.0).

The statutory scheme and the implementing regulations promulgated by the Commissioner of Consumer Affairs provide for the licensing of such repair and service dealers and comprehensive disclosure rules designed to insure that the consumer is sufficiently apprised of the anticipated costs and of the obligations undertaken by repairmen.[2] A licensee is thus required to conspicuously post its license and a sign advising consumers of their rights (Administrative Code, § 773-13.0; Department of Consumer Affairs Rules and Regulations Relating to Television, Radio and Audio Equipment, Phonograph Service and Repairs, City Record, Jan. 23. 1975, pp 264-266). In addition, all work performed by the licensee is to be recorded on an invoice containing the license number and other details and a copy delivered to the customer and a copy retained by the licensee for a period of three years (Administrative Code, § B32-472.0, subd 1). Such invoices and other records required by regulation "shall be open and available for reasonable inspection by the commissioner or other law enforcement officials, and shall be kept for a period of three years" (Administrative Code, § B32-472.0, subd 5).

The legislation also directs the Commissioner of Consumer Affairs to conduct periodic inspections to insure that licensees comply with the terms of their license and governing regulatory provisions (Administrative Code, § 773-13.0). To that end, the Commissioner has instituted a random computer selection method whereby licenses are regularly inspected about once a year and, to limit the scope of the inspection, inspectors are provided with a form which they are to follow.

## II

We turn, then, to a review of the factual background of the case now before us.

On June 6, 1979 and June 22, 1979, respectively, Inspector Joseph Laura of the Department of Consumer Affairs arrived at the store fronts of Glenwood TV, Inc., and

---

**2.** The provisions of Local Law No. 74 of 1973 and the implementing regulations were sustained in *Metropolitan Electronic Tel. Serv. Dealers Assn. v Guggenheimer* (NYLJ, July 2, 1975, p 12, col 5, affd 51 AD2d 922, mot for lv to app den 39 NY2d 709).

Charles TV, Inc., both of which were licensed pursuant to the Administrative Code. Upon entering the area open to the public at each location, he first checked to see that the required signs informing consumers of their general legal rights were conspicuously posted. Finding that they were, he then asked each proprietor for a sampling of the estimates, work orders and final bills that they were required to keep. On both occasions this request was refused. There is no indication or claim that the inspector attempted to enter any area of the business not otherwise accessible to the general public. Nor does either party contend that the statutes in question purport to authorize such entry or that inspectors make such entries without the consent of the proprietor.

Consequently, administrative charges were filed against both licensees, and, on consent, the actions were consolidated for the purpose of a hearing, which was held on November 13, 1979. At the hearing, both licensees admitted their refusal to supply the requested documentation, stating that their refusal was prompted by instructions from the Metropolitan Electronic Television Service Dealers Association's counsel to supply this documentation only when inspections are conducted in response to specific consumer complaints and to refuse when subjected to periodic inspection. It was the Association's position, adopted by both licensees at the hearing, that these periodic inspections were too frequent, as they took between an hour and two hours to complete, and were therefore unreasonably disruptive of small business operations.[3]

The Department of Consumer Affairs produced Principal Inspector Christopher Bossis and Inspector Joseph Laura to testify to the standard inspection procedures and those specifically employed with respect to these licensees. Principal Inspector Bossis stated that routine periodic inspections of dealers were randomly scheduled by computer about once a year and that it would be virtually impossible for a single licensee to be scheduled for regular inspection

---

**3.** In support of these contentions, Mr. Pearlman, principal of Glenwood TV, testified that in the year preceding this refusal to produce these documents his business had been inspected at least 4 and as many as 6 times, with each inspection lasting 1 to 2 hours. Charles Goldberg of Charles TV similarly testified that he had been subjected to inspections 2 to 3 times in the preceding year with a similar imposition on his business.

four to six times in one year. Both inspectors stated that the procedure employed should take a maximum of one-half hour to complete and routinely last as little as 15 minutes. The presence of an inspector for more than a half hour would only result if the inspection was interrupted by the entrance of customers during the inspection, as it is the Department's practice to accommodate dealers by allowing them to interrupt the inspection and tend to customers. Indeed, one of the petitioners admitted that this was routinely done but claimed that inspections were nonetheless disruptive of customer relations because "[t]he shops are generally small, and the inspector can overhear anything that goes on, pertaining to your dealings with your consumers".

A written decision was rendered fining each licensee $300 and ordering them to "make available for inspection all required records requested by this Department" within five days of notice of the decision. The hearing officer found that the inspections were lawfully authorized by the City Council, that the inspections were reasonable in both frequency and duration, and that both licensees willfully refused to submit to them. The licensees were notified of the decision by a letter dated January 15, 1980, and, when they failed to comply with its terms, they were informed that their licenses would be suspended effective March 5, 1980. When the licensees further refused to surrender their licenses and cease operation pursuant to the notice of suspension, the Department revoked their licenses.

The licensees did file administrative appeals, raising their constitutional claims for the first time; however, the appeals were denied as untimely as both licensees had been granted an extension of time until February 8, 1980 to file an appeal, but had not done so until February 15, 1980.

Subsequently, petitioners commenced these proceedings to review the administrative determinations upon the ground that Local Law No. 74 of 1973 is, among other things, violative of their Fourth Amendment protections against warrantless searches and seizures (US Const, 4th Amdt). Special Term treated these proceedings as "hybrid

proceedings for both Article 78 and declaratory relief",[4] and, in a far-ranging opinion, agreed with petitioners, and set forth elaborate notice and warrant requirements. We reverse.

## III

■ At the outset, a matter of procedure must be addressed. While the petitioners' failure to exhaust administrative remedies does not bar a challenge to administrative action as either unconstitutional or beyond the agency's statutory power (*Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52, 57; cf. *Matter of Celestial Food Corp. v New York State Liq. Auth.*, 99 AD2d 25, 27), it does limit the scope of judicial review to the face of the statute itself (*Young Men's Christian Assn. v Rochester Pure Waters Dist.*, 37 NY2d 371, 375-378; cf. *Skylab Realty Corp. v New York Prop. Ins. Underwriting Assn.*, 96 AD2d 939). Accordingly, we must presume that the inspections were conducted in a reasonable fashion and accept the findings of the hearing officer (see *Young Men's Christian Assn. v Rochester Pure Waters Dist., supra*).

While, as petitioners urge, the city cannot require them to submit to blanket warrantless searches as a condition of licensing (see, e.g., *Matter of Finn's Liq. Shop v State Liq. Auth.*, 24 NY2d 647, 658, cert den 396 US 840), such an approach begs the question now before us. The analysis of any search and seizure claim, and correspondingly the Fourth Amendment's warrant clause, must begin with a threshold determination of whether the subject of the search possesses a reasonable expectation of privacy in the area or items searched (*Rakas v Illinois*, 439 US 128, 143; *Katz v United States*, 389 US 347, 351; *People v Ponder*, 54 NY2d 160; *People v Lerhinan*, 90 AD2d 74, 75). And, "unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment * * * The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commer-

---

4. No one has questioned the propriety of this procedure, and we do not pass on it.

cial property enjoys in such property differs significantly from the sanctity accorded an individual's home" (*Donovan v Dewey,* 452 US 594, 598-599).

Significantly, petitioners do not complain here about the presence of an inspector on the public portions of their premises for determining that they have complied with applicable posting requirements. Indeed, any complaint would be futile because it is basic that there can be no reasonable expectation of privacy in public areas of a commercial establishment (see *Matter of Salob v Ambach,* 73 AD2d 756, 757, mot for lv to app den 49 NY2d 703, app dsmd 49 NY2d 800, cert den 449 US 829) for "[w]hat is observable by the public is observable, without a warrant, by the Government inspector as well" (*Marshall v Barlow's, Inc.,* 436 US 307, 315; cf. *People v Rizzo,* 40 NY2d 425, 428-429) and an inspector, like a customer, needs no judicial process to enter (*Donovan v Lone Steer,* 464 US __, 104 S Ct 769).

Instead, respondents focus on the records they are required by law to keep. They claim that such records need not be submitted for inspection to an inspector lawfully in their shop absent a warrant, and that no sanctions may be imposed for their failure to do so.[5]

The difficulty with this thesis is that the warrant clause has long been deemed inapplicable to "required records" which "are in the public domain" and, as a result, "their custodian is not afforded the traditional protections of the fourth or fifth amendments" (*United States v Pine Val. Poultry Distrs. Corp.,* 187 F Supp 455, 457; see, e.g., *Shapiro v United States,* 335 US 1, 32-34; *Boyd v United States,* 116 US 616, 623-624). It is clear that "the modern businessman has little or no expectation of privacy in his business records, especially those documents prepared in compliance with regulatory requirements" (*Interstate Commerce Comm. v Gould,* 629 F2d 847, 858, cert den 449 US 1077; cf. *Matter of Hynes v Moskowitz,* 44 NY2d 383, 395, app dsmd 439 US 921). Numerous authorities demonstrate this principle (see, e.g., *United States v Snyder,* 668

---

5. The constitutionality of the record keeping requirement itself has already been established (*Metropolitan Electronic Tel. Serv. Dealers Assn. v Guggenheimer,* NYLJ, July 2, 1975, p 12, col 5, affd 51 AD2d 922, mot for lv to app den 39 NY2d 709).

F2d 686, 690 [records of union pension and welfare fund required to be kept by law]; *Donovan v Mehlenbacher,* 652 F2d 228, 231 [records required to be kept by farmer employing migrant workers]; *Matter of Grand Jury Proceedings,* 601 F2d 162, 167-168, 170 [records required by regulations to be kept by custom-house broker]; cf. *Civil Aeronautics Bd. v United Airlines,* 542 F2d 394, 401-402 [records required to be kept by airline carrier]; *Securities & Exch. Comm. v Olsen,* 354 F2d 166, 170 [records required to be kept by investment advisors]; *Cooper's Express v Interstate Commerce Comm.,* 330 F2d 338, 340-341 [records required to be kept by interstate motor carrier]).

In short, statutory schemes requiring licensees to have books and records available for inspection during reasonable business hours are quite common (see, e.g., Alcoholic Beverage Control Law, § 105, subd 15; Insurance Law, §§ 24, 28, 29, 36-a; Public Health Law, § 3308; Vehicle and Traffic Law, § 415-a) and have long passed constitutional muster (e.g., *United States v Gordon,* 655 F2d 478; *United States ex rel. Terraciano v Montanye,* 493 F2d 682, cert den *sub nom. Terraciano v Smith,* 419 US 875; *Matter of McKaba v Board of Regents,* 30 AD2d 495). There is "no meaningful difference between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with [governmental] officers * * * '[r]egulations permit records to be retained, rather than filed, largely for the convenience of the persons regulated' " (*Marchetti v United States,* 390 US 39, 56, n 14).

The authority to inspect records, which is at issue, is essentially an analogue of the power conferred upon an agency to issue a subpoena duces tecum. The Fourth Amendment is satisfied if the authority to inspect is exercised reasonably and if judicial review is available before a person is ultimately required to submit to an inspection (e.g., *Matter of Nicholson v State Comm. on Judicial Conduct,* 50 NY2d 597, 610-611; *Matter of A'Hearn v Committee on Unlawful Practice of Law,* 23 NY2d 916; *Civil Aeronautics Bd. v United Airlines,* 542 F2d 394, *supra;* cf. *United States v Morton Salt Co.,* 338 US 632; *Matter of Levin v Murawski,* 59 NY2d 35).

To be sure, there are limitations. "Unbridled" administrative discretion will not do (see *Donovan v Dewey,* 452 US 594, 599, *supra; Marshall v Barlow's, Inc.,* 436 US 307, 323, *supra*). The propriety of a warrantless administrative inspection scheme is measured by a balancing of enforcement goals and needs against the privacy and regulatory guarantees within the statutory framework (*Marshall v Barlow's, Inc., supra*). Inasmuch as the inspections here were limited to required records and the licensees' public areas, the statutory safeguards were sufficient to protect their legitimate privacy concerns (see, e.g., *United States ex rel. Terraciano v Montanye,* 493 F2d 682, *supra*).

Similarly, the "certainty and regularity" of the scheme's application is sufficiently tailored to goals and enforcement needs and thus "provides a constitutionally adequate substitute for a warrant" (*Donovan v Dewey,* 452 US 594, 603, *supra*). The legislative findings, to which we defer (*Donovan v Dewey, supra,* p 603), plainly support the need for surprise "if inspection is to be effective and serve as a credible deterrent" (*United States v Biswell,* 406 US 311, 316; see, also, *Marshall v Barlow's, Inc., supra,* p 316). Parenthetically we note that discretion is limited through the use of a standard uniform checklist issued to inspectors, and the employment of a computerized random selection process.[6]

In this regard, we are not persuaded that an ex parte warrant or subpoena is a necessary condition precedent to an administrative inspection. Since the administrative orders are not self-executing and may only be enforced with judicial assistance (Administrative Code, § 773-5.0), there is an adequate forum for the licensee to obtain judicial review of any constitutional claims prior to enforcement (cf. *Matter of Friedman v Hi-Li Manor Home for Adults,* 42 NY2d 408, 413). That is all that the Constitution requires (see *Donovan v Dewey, supra,* pp 604-605).[7]

---

**6.** The inspectors do not seek evidence of a crime and their function is limited to insuring compliance with a civil regulatory scheme (cf. *People v Pace,* 101 AD2d 336).

**7.** We note that in January, 1982, the City Council enacted Local Law No. 5 of 1982, commonly referred to as the "Padlock Law," which conferred additional enforcement powers on the Commissioner of Consumer Affairs, including the authority to enforce orders without judicial assistance (see Greenman, The Padlock Law, NYLJ, April 30, 1982, p 1, col 1). The question of whether the procedures authorized by the Padlock Law are constitutionally offensive is not now before us.

In fact, the administrative procedures under review provide more protection than a traditional search warrant, which is issued ex parte and is executed under the compulsion of the threat of force. No matter how intrusive the search may be, the individual at whom it is directed must comply. Under the procedures employed by the Commissioner of Consumer Affairs, once petitioners refused to comply, the Commissioner's only recourse was to administrative and judicial process (cf. *Matter of Hynes v Moskowitz,* 44 NY2d 383, 394-395, app dsmd 439 US 921, *supra*).

In sum, the challenged provisions of the Administrative Code of the City of New York are not violative of the Fourth Amendment. Accordingly, the judgments should be reversed, with one bill of costs, the determinations of the Department of Consumer Affairs confirmed and the proceedings dismissed on the merits, and a declaration made that the challenged provisions of the Administrative Code are constitutional.

GIBBONS, J. (dissenting in part). We are asked in this case to determine whether a municipality may require a person who is in the business of servicing televisions or radios to submit to an inspection of his business records without a warrant or its functional equivalent, e.g., an administrative subpoena. I believe that it may not, and, accordingly, would declare such an ordinance to be unconstitutional insofar as it purports to authorize such inspections. I therefore respectfully dissent in part.

In 1973, the City of New York enacted an ordinance (Administrative Code of City of New York, ch 32, tit B, art 44) which provides for the licensing and regulation by the Commissioner of Consumer Affairs (the Commissioner) of persons engaged in the servicing of television, radio or audio equipment. The ordinance is designed to protect the public "from unethical and financially unstable service dealers" (Administrative Code, § B32-465.0). Besides setting forth a licensing procedure, the ordinance prescribes certain "Duties of licensees", in pertinent part, as follows:

"1. All work done by a service dealer shall be recorded on an invoice which shall contain the license number and such other detail as may be required by regulations promulgated by the Commissioner. The invoice shall fully,

separately and clearly describe all service work performed, all parts supplied, the date or dates thereof, and all charges made and computations thereof. One copy of the invoice shall be delivered to the customer and one copy shall be retained by the service dealer for a period of at least three years from the date of such delivery * * *

"3. The service dealer shall comply with regulations promulgated by the commissioner setting forth requirements for estimates or the making of such estimates and shall inform the customer as to the cost thereof prior to rendering same * * *

"5. A service dealer shall maintain such additional records as are required by regulations adopted by the commissioner to carry out the provisions of this article. *Such records shall be open and available for reasonable inspection by the commissioner or other law enforcement officials, and shall be kept for a period of three years*" (Administrative Code, § B32-472.0, subds 1, 3, 5; emphasis supplied).

Pursuant to his power to implement and enforce the ordinance (Administrative Code, § B32-473.0), the Commissioner has promulgated regulations requiring service dealers to give to each customer a written estimate, a work order, and a final bill. The regulations require that copies of these documents be retained for three years.

At the heart of this case is the provision in the ordinance, quoted above, that "records shall be open and available for reasonable inspection by the commissioner or other law enforcement officials, and shall be kept for a period of three years". A similar provision is found in subdivision a of section 773-13.0 of the Administrative Code, pertaining to licensed businesses generally. It states that "[a]ll licensed * * * places of business shall be regularly inspected, and reports thereof shall be made to the commissioner". Also of relevance are subdivisions 1 and 2 of section B32-478.0 of the Administrative Code, entitled "Powers and duties of the commissioner", stating:

"1. *In addition to any other powers of the commissioner*, and not in limitation thereof, the commissioner shall have the power to enforce the provisions of this article, to investigate any violation thereof, *and to investigate the business, business practices* and *business methods of any*

*person* who is or may be subject to this article, if in the opinion of the commissioner, such investigation is warranted. *Each person shall be obligated upon the request of the commissioner, to supply such information as may be required concerning the business, business practices or business methods or the proposed business practices or business methods.*

"2. For the purpose of enforcing the provisions of this article and in conducting investigations relating to any violation thereof, and for the purpose of investigating the character, competence and integrity of any person who is or may be subject to this article, and the business, business practices and business methods thereof, *the commissioner, or commissioner's designee shall have the power to compel the attendance of witnesses and the production of books and records,* in accordance with the provisions of the civil practice law and rules. However, no information supplied by any person at the request of the commissioner concerning his business, business practices or business methods, or proposed business practices or methods shall be disclosed, except as may be necessary for the purpose of enforcing the provisions of this article" (emphasis supplied).

In the event that a service dealer violates any provision of the ordinance or the regulations adopted thereunder, or fails "to comply with any order, demand, regulation or requirement made by the commissioner pursuant to the provisions of this article," the Commissioner may impose a fine, or may deny renewal of, suspend, or revoke the dealer's license (Administrative Code, § B32-475.0, subds [h], [i]).

Glenwood TV, Inc. (Glenwood), and Charles TV, Inc. (Charles), are television and radio repair businesses located in Brooklyn, New York, and are licensed by the Commissioner. On June 6, 1979, Glenwood was the subject of an inspection conducted by Joseph Laura, an employee of the New York City Department of Consumer Affairs (the Department). After checking to see if the shop's license and certain required notices to customers were properly displayed, Laura asked to examine the records which the business was required to maintain over a three-year period. His request was refused. Similarly, on June 22, 1979,

Inspector Laura was denied access to the records of Charles.

Subsequently, both licensees were charged by the Commissioner with violating subdivision 5 of section B32-472.0 of the Administrative Code. After a joint hearing before a representative of the Commissioner, each was fined $300 and was ordered "to make available for inspection all required records records requested by the Department within five (5) days of the date of this order", or face "immediate suspension of the license(s)". After refusing to comply with this order and a subsequent order of suspension which threatened revocation, the licenses of both were revoked by the Commissioner.

Glenwood and Charles then commenced suit in the form of parallel proceedings pursuant to CPLR article 78, and, in their petitions, requested, among other things, vacatur of the determination that they were guilty of violating subdivision 5 of section B32-472.0, and reinstatement of their licenses. In support of their position, the petitioners set forth the following contentions: (1) that subdivision 5 of section B32-472.0 only requires service dealers to submit to "reasonable inspection", and Inspector Laura's inspections were not reasonable; (2) that Glenwood and Charles properly denied access of their records to Mr. Laura inasmuch as the Fourth Amendment of the United States Constitution prohibits compulsory administrative inspections of documents absent a warrant or subpoena; and (3) that the ordinance is unconstitutional inasmuch as it fails to prescribe standards to guide inspectors in its administration.

Special Term, in a decision dated June 1, 1981 (see *Matter of Glenwood TV [Ratner]*, NYLJ, June 9, 1981, p 12, col 3), granted the relief requested "in all respects". The court treated the proceedings as actions for declaratory judgment as well as proceedings brought pursuant to article 78. The court went on, in its decision, to declare that subdivision 5 of section B32-472.0 and section 773-13.0 of the Administrative Code are "unconstitutional under the Fourth Amendment of the United States Constitution insofar as they purport to authorize non-consensual periodic inspections of radio and television repair shops without a

search warrant" (p 12, col 6). The court explicitly noted, however, that inspections could still be conducted under the ordinance provided that they were " 'reasonable' ", and opined that in order to be "reasonable" under the Fourth Amendment, an inspection "must be preceded by advance written notice, of at least one week" (p 12, col 6). Further, "[i]f the owner or occupant insists on a search warrant, then the inspector must obtain a warrant before proceeding with the inspection" (p 12, col 6).

The Commissioner has appealed from the judgments entered subsequent to Special Term's decision. Interestingly, while both judgments declare that subdivision 5 of section B32-472.0 and section 773-13.0 of the Administrative Code are unconstitutional insofar as they purport to authorize inspections without a search warrant, neither says anything about the need for advance written notice prior to such an inspection.

As a procedural matter, I believe that Special Term quite properly treated each of these lawsuits as a hybrid combination of a proceeding pursuant to CPLR article 78 and an action for a declaratory judgment (see *Matter of Kovarsky v Housing & Dev. Admin.*, 31 NY2d 184, 191-192; *Kent's Lounge v City of New York*, 104 AD2d 397; *Matter of Heimbach v Mills*, 54 AD2d 982). While the issue has not been pressed by the Commissioner, I also believe that Special Term properly ruled that the constitutional issues raised by Glenwood and Charles were properly before it, notwithstanding their failure to litigate the same at the administrative level. The hearing officer lacked the requisite authority to rule on the question of the constitutionality of the inspections, such being a proper subject for the court to determine within the context of a declaratory judgment action or other appropriate judicial proceeding (*Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52, 57-58; *Baddour v City of Long Beach*, 279 NY 167, 177; *Matter of Celestial Food Corp. v New York State Liq. Auth.*, 99 AD2d 25, 27, n).

I also agree with Special Term on the merits insofar as it concluded that a television or radio repair shop may not be compelled to produce its business records for inspection in the absence of a warrant or its functional equivalent, e.g.,

an administrative subpoena. However, I disagree with the further conclusion that a service dealer is entitled to advance notice of any such inspection.

My analysis of this case begins with the Supreme Court's decisions in *Camara v Municipal Ct.* (387 US 523) and *See v City of Seattle* (387 US 541), for, in my view, the application of the constitutional principles found therein cannot be avoided. The Supreme Court in *Camara* applied the Fourth Amendment "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" to administrative inspections, and held that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant" (*Camara v Municipal Ct., supra,* pp 528-529). At issue in *Camara* (*supra,* p 526), was the validity of an ordinance which allowed a building inspector " 'the right to enter, at reasonable times, any building' " in order to determine compliance with the city's housing code. Any person who prohibited such access was subject to criminal sanctions. Balancing the need for a warrantless search and the governmental purpose to be served against the invasion which such a search entailed, the court held that a warrant was required and that, absent an emergency, a person could properly withhold his consent to a search of his house where there was no warrant. Inspections for the purpose of enforcing a building code were not, therefore, held to fall within the "carefully defined classes of cases" which are exempt from the warrant requirement.

On the same day that it decided *Camara* (*supra*), the Supreme Court also rendered its opinion in *See v City of Seattle* (387 US 541, *supra*) in which the court held that the Fourth Amendment and the principles set forth in *Camara* were applicable to businesses as well as residences. Specifically, the court held that "administrative entry, without consent, upon the portions of commercial premises which [are] not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure" (*See v City of Seattle, supra,* p 545).

Thus, it appears to me that, unless some exception to the warrant requirement applies, *Camara* and *See* (*supra*)

would require the issuance of a warrant or its functional equivalent to conduct the inspections sought by the Commissioner of Glenwood's and Charles' business records.

The majority and the Commissioner attempt to short-circuit an analysis of the issues at bar based on *Camara* principles by arguing that Glenwood and Charles have no legitimate expectation of privacy in the business records which they are required by law to keep. Remarking that these documents "are merely copies of original written estimates, work orders, and final bills that the service dealers gave their customers", the Commissioner argues that the Fourth Amendment is inapplicable. Since the documents have already been made public, by giving the originals to customers, a service dealer allegedly does not retain any privacy interest in them. Reliance in this regard is placed on *United States v Miller* (425 US 435), in which the Supreme Court held that a depositor cannot complain on Fourth Amendment grounds when his bank turns over records of his checks and deposits to government agents.

In my view, *Miller* (*supra*) is distinguishable. If the issue at bar was the propriety of petitioners' customers turning over to appellant copies of the bills given to them by petitioners, then *Miller* would be squarely on point. However, individuals do not forfeit their expectation of privacy in an item merely because a third party has access to it. Letters provide a good analogy. Just because a letter has been sent to, and presumably read by, a third party does not mean that the writer/sender has given up his expectation of privacy in the copy retained by him.

The same contention being urged upon us by the Commissioner was argued unsuccessfully by the Secretary of Labor in *Marshall v Barlow's, Inc.* (436 US 307), a case involving the authority of Congress to authorize warrantless inspections under the Occupational Safety and Health Act of 1970 (OSHA). The Secretary contended that since employees of a business have access to the so-called private areas of the business, OSHA investigators should also, since the exposure of these areas to the employees vitiated the employer's expectation of privacy therein. The Supreme Court retorted: "That an employee is free to report, and the Government is free to use, any evidence of noncom-

pliance with OSHA that the employee observes furnishes no justification for federal agents to enter a place of business from which the public is restricted and to conduct their own warrantless search" (*Marshall v Barlow's, Inc., supra,* p 315).

As for the further contention that the documents in question fall within the " 'required records' exception", the Commissioner maintains that this exception stands for the proposition that "whatever minimal expectations of privacy television, radio and audio dealers may have in their business records generally, they can claim none in the copies they keep * * * which they are required by law to keep, subject to inspection". Both the Commissioner and the majority cite to numerous cases in support of this position, but as the petitioners correctly point out, all of these cases "involve some form of * * * process", such as a subpoena or an injunction. What is involved in this case, however, is a demand to inspect business documents without any process, followed, eventually, by a fine and license revocation, without judicial sanction, when consent is refused. None of the cited cases allows for such a procedure (see, e.g., *California Bankers Assn. v Shultz,* 416 US 21; *Interstate Commerce Comm. v Gould,* 629 F2d 847; *Matter of Hynes v Moskowitz,* 44 NY2d 383). Indeed, such a procedure is far different, conceptually, from a typical filing requirement (cf. *Marchetti v United States,* 390 US 39, 56, n 14).

Were I, nevertheless, to accept the position that the petitioners have no legitimate expectation of privacy in the records at issue, I would be forced to conclude that the principles of *Camara* (*supra*) generally have no application to inspections involving commercial documents. However, such a holding would, in my view, violate the letter and the spirit of the Fourth Amendment, which protects, among other things, the "right of the people to be secure in their * * * papers". If anything, the need to protect privacy interests in documents and other records is more vital than with other areas of Fourth Amendment concern. Thus, in discussing the functions a warrant should perform, the Supreme Court noted in *Marshall v Barlow's, Inc.* (436 US 307, 324, n 22, *supra*) that "[d]elineating the scope of a

search with some care is particularly important where documents are involved". And in *See v City of Seattle* (387 US 541, 544-545, *supra*), the court looked at its prior subpoena cases to derive its conclusion that warrantless inspections of commercial premises are presumptively improper. It noted (p 544) that "when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome" (see, also, *Meyerson v Lentini Bros. Moving & Stor. Co.*, 33 NY2d 250; *Matter of Carvel Corp. v Lefkowitz*, 77 AD2d 872). Further, "while the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply" (*See v City of Seattle, supra,* pp 544-545; see *Matter of Hynes v Moskowitz,* 44 NY2d 383, 393, *supra*). With these principles in mind, the Supreme Court then concluded: "[W]e find untenable the proposition that the subpoena, which has been termed a 'constructive' search * * * is subject to Fourth Amendment limitations which do not apply to actual searches and inspections of commercial premises" (*See v City of Seattle, supra,* p 545). Reasoning in the opposite direction, I would conclude that, generally, absent a subpoena or consent, the same Fourth Amendment protections which apply to the nonpublic areas of commercial premises should also apply to the inspection of records conducted at a business site.

There is, of course, a recognized exception to the general rule that, absent consent or an emergency, an administrative search requires a warrant. Thus, in certain circumstances, industries which are "closely regulated" and "long subject to close supervision and inspection" or which are "pervasively regulated" can be subjected to warrantless inspections (*Colonnade Corp. v United States,* 397 US 72, 74, 77; *United States v Biswell,* 406 US 311, 316). Industries involving firearms (*United States v Biswell, supra*), liquor (*Colonnade Corp. v United States, supra*), and the

like, all come within the " 'carefully defined classes of cases' " mentioned in *Camara (supra)* (*Marshall v Barlow's, Inc.,* 436 US 307, 313, *supra*), as the law presumes that "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation", including the power to conduct warrantless searches, if authorized (*Marshall v Barlow's, Inc., supra,* p 313; *Sokolov v Village of Freeport,* 52 NY2d 341, 346, n 1). However, more to the point than a presumption of consent, in such industries warrantless inspections may advance urgent governmental interests which outweigh the interest in privacy (*United States v Biswell, supra,* pp 315-317; *Colonnade Corp. v United States, supra,* pp 76-77). Nonetheless, there is one caveat, for even when an industry is pervasively regulated or has a long history of close supervision, warrantless searches are not necessarily proper. The Legislature must still specifically authorize inspections without a warrant, and the regulatory inspection system must be "carefully limited in time, place, and scope" (*United States v Biswell, supra,* p 315; *Colonnade Corp. v United States, supra,* p 77). As more recently expressed by the Supreme Court in a case involving the pervasively regulated mining industry, the Legislature must have "reasonably determined that warrantless searches are necessary to further a regulatory scheme and the * * * regulatory presence [must be] sufficiently comprehensive and defined [so] that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes" (*Donovan v Dewey,* 452 US 594, 600).

Significantly, the Commissioner does not attempt to show that the television and radio repair shop industry is closely regulated in the sense of the *Colonnade/Biswell* exception. Nor could he with any degree of persuasiveness. The only State statutes of which I am aware that regulate this business are sections 597 and 598 of the General Business Law, imposing fines on laundries, shoemakers, television and radio repair shops, and the like for not giving customers receipts on request when merchandise is left to be worked on. These sections are of relatively recent vintage, having been passed in 1971. The New York City

ordinance involved here, passed in 1973, is fairly rigorous. However, it is primarily confined to that aspect of the business which concerns honesty to patrons. Applying *Colonnade/Biswell* to this type of case would cause the exception to swallow the rule favoring warrants (see *Marshall v Barlow's, Inc.,* 436 US 307, 313, *supra*).

Nonetheless, the majority and the Commissioner vigorously argue that the inspection system employed by the Department, pursuant to which Inspector Laura visited Glenwood and Charles, is carefully designed, so that the abuses which allegedly concerned the court in *Camara, See* and *Marshall* (*supra*) are not present. Thus, according to the Commissioner, "nothing can be gained through individualized review of the inspector's authority by a magistrate in advance of inspection". Reference is made to the hearing record, to the effect that the Department has adopted a plan whereby service dealers are randomly chosen for inspection by computer. Once selected, the Department's dispatch unit designates the employee who is to make the inspection. Inspectors do not have discretion as to which dealers they will visit, and it would be unusual for a service dealer to be subject to more than one inspection a year. A standard form is used to insure that inspections are conducted in a uniform manner, and it generally takes no longer than half an hour to complete an inspection, providing there are no interruptions.

Notably, petitioners dispute the effectiveness of this alleged plan. At the hearing, Glenwood's president testified that within the year prior to the hearing there had been 4 to 6 inspections, taking from 1 to 2 hours to complete. He stated that the resultant disruptions made it impossible to do business. A representative from Charles testified to like effect. In any event, I disagree with the contention that an inspection plan devised by the Department can serve as a substitute for the warrant requirement. How the Department designs an inspection system or procedure does not affect the question of whether or not a warrant is needed, once it is concluded that the television and radio repair industry is not pervasively or closely regulated. That an inspection may be carefully limited in time, place and scope does not necessarily mean that it can

proceed without prior judicial approval. Such is only the case when the industry involved is one of the *Colonnade/ Biswell* type, that is, is pervasively or closely regulated, and where the Legislature has reasonably determined that warrantless searches are necessary to monitor the industry (*Donovan v Dewey,* 452 US 594, *supra; United States v Biswell,* 406 US 311, *supra; Colonnade Corp. v United States,* 397 US 72, *supra*). Absent affirmative findings as to these two requirements, statutory or regulatory safeguards cannot substitute for the individualized review imposed by a warrant procedure (*Camara v Municipal Ct.,* 387 US 523, 531-533, *supra*).

Thus, in the case of *Sokolov v Village of Freeport* (52 NY2d 341, *supra*), the municipality attempted to argue that procurement of a warrant was unnecessary because the limited nature of its mandatory inspections of prospective rental premises was so restricted as to render minimal any resulting intrusion. Our Court of Appeals, citing *Camara* (*supra*), found that "there would nevertheless be a serious intrusion upon the interests of the owner deserving of constitutional protection" (*Sokolov v Village of Freeport, supra,* p 347). Similarly, in *Marshall v Barlow's, Inc.* (436 US 307, 315, *supra*), the Secretary of Labor argued that the restrictions placed on OSHA inspections obviated the need for a warrant. Furthermore, the Secretary maintained that the warrantless inspections were necessary to further the purposes of OSHA, a contention which is singularly missing in the Commissioner's repertoire of arguments in this case. The Supreme Court disagreed with the Secretary of Labor. It noted that a warrant "would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed" (*Marshall v Barlow's, Inc., supra,* p 323).

The functions of a warrant procedure are indeed vital to the protection of our Fourth Amendment rights. As noted in *Marshall* (*supra*), one function is to inform the citizen. In nonpervasively regulated businesses, "when the inspector

demands entry [sans warrant], the occupant has no way of knowing whether enforcement of the [ordinance] involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization" (*Camara v Municipal Ct.,* 387 US 523, 532, *supra*). Further, review by a neutral magistrate will tend to prevent abusive searches. No matter how circumscribed a regulatory inspection system is, without a warrant the citizen is subject to the discretion of the officer in the field. The system in this case presents a good illustration. There is no evidence in the record that, under the Department's plan, inspections must occur at specified times. Further, while, generally, inspections only take half an hour or less, what would prevent an oppressive or vindictive inspector from taking all day, resulting in a tremendous disruption in business? Glenwood and Charles claim that inspections sometimes can take up to 1½ to 2 hours to complete. Control over the scope of an inspection is particularly important where documents are involved (*Marshall v Barlow's, Inc., supra,* p 324, n 22). The documents in question must be retained for three years, and so far as the record shows, there is nothing to prevent an inspector from arbitrarily demanding to see, and then reading, every document going back the full three years. Done in the shop, perhaps on a busy afternoon, such an inspection could be very disruptive of business. While, in practice, this would probably happen rarely, it should not be left to the discretion of the employee in the field.

As already stated, an important function of a warrant is to assure the individual that there has been judicial consideration of the reasonableness of the inspection. Thus, it cannot be said that the imposition of a civil or criminal penalty for refusing to comply with an inspection demand supported by a warrant is unfair because of a lack of judicial involvement. A similar opportunity for judicial review, through a motion to quash, sanctifies the imposition of penalties when a person or business refuses to comply with a subpoena (*Donovan v Lone Steer,* 464 US __, 104 S Ct 769; *See v City of Seattle,* 387 US 541, 544-545, *supra*). For this reason, process by subpoena does not

violate the Fourth Amendment, and a subpoena can serve as an analogue to a warrant to inspect records. In fact, the Supreme Court has held that, with administrative searches, an inspection is proper if supported by a warrant or its functional equivalent (*Marshall v Barlow's, Inc.,* 436 US 307, 325, n 23, *supra;* see, also, *Donovan v Dewey,* 452 US 594, 604-605, *supra*). A subpoena, with the concomitant right to judicial review, is just such an equivalent.

The Commissioner maintains that his orders are not self-executing and that an order or judgment from a court is necessary to compel compliance. Therefore, according to both the Commissioner and the majority, the petitioners have at their disposal sufficient judicial procedures to safeguard their constitutional rights. I disagree with both the premise and the conclusion. Whether or not the Commissioner needs a judgment in order to execute on a fine, he still has the authority to suspend or revoke a license on his own (Administrative Code, §§ B32-475.0, 773-4.0, subd e). The only review possible is by way of a proceeding under CPLR article 78 or an action for a declaratory judgment. This is no more a substitute for a warrant requirement than was the writ of prohibition brought by the homeowner in *Camara v Municipal Ct.* (387 US 523, *supra*). To be the functional equivalent of a warrant, judicial review in some form must, at least, be available *prior* to the imposition of any penalty for refusing to comply with an inspection demand and *prior* to any act of force which would compel a search despite protest (see *Marshall v Barlow's, Inc., supra,* p 325, n 23; *See v City of Seattle, supra,* p 545; cf. *Matter of Hynes v Moskowitz,* 44 NY2d 383, *supra*).

While I would therefore conclude that Glenwood and Charles are entitled to the rescission of the fines imposed against them, reinstatement of their licenses, and a declaration that the ordinance is unconstitutional insofar as it purports to authorize an inspection of required records without a warrant or its functional equivalent, I would hasten to note that, as the Court of Appeals reminded us in *Sokolov v Village of Freeport* (52 NY2d 341, 348, *supra*), "the *Camara* opinion expressly provide[s] that the strict standards attending the issuance of a warrant in criminal cases are not applicable to the issuance of a warrant

authorizing an administrative inspection". Thus, as the Supreme Court reiterated in *See v City of Seattle* (*supra,* p 545), "[t]he agency's * * * demand for access [must] of course be measured, in terms of [the] probable cause [necessary] to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved".

The need to effectively enforce the legitimate goals of the ordinance also compels me to disagree with Special Term's conclusion that a service dealer is entitled to one week's notice prior to an inspection. While the New York City Council could certainly add this requirement to the ordinance, or, alternatively, the Commissioner might choose to promulgate such a regulation, the Constitution clearly does not require it. To the contrary, effective enforcement may require surprise inspections, albeit, supported by a warrant or its functional equivalent (*See v City of Seattle,* 387 US 541, 545, n 6, *supra;* see, also, *Marshall v Barlow's, Inc.,* 436 US 307, 316-320, *supra*). Moreover, I would not preempt warrantless inspections where a true emergency exists (*Sokolov v Village of Freeport, supra,* p 349; see *People v Calhoun,* 49 NY2d 398). While it is difficult in the case of business records to envision such an emergency, I am not prepared to say that such could never arise.

Accordingly, I would modify the judgments appealed from so as to declare that subdivision 5 of section B32-472.0 and section 773-13.0 of the Administrative Code of the City of New York are unconstitutional insofar as they purport to authorize nonconsensual periodic inspections of the records of television and radio repair businesses without a warrant or its functional equivalent, and, as so modified, affirm.*

THOMPSON and RUBIN, JJ., concur with TITONE, J. P.; GIBBONS, J., dissents in part and votes to modify the judgments appealed from in an opinion in which BRACKEN, J., concurs.

---

* *Metropolitan Electronic Tel. Serv. Dealers Assn. v Guggenheimer* (51 AD2d 922, mot for lv to app den 39 NY2d 709) is not to the contrary, as the court therein was never called upon to pass on this aspect of the ordinance.

Two judgments of the Supreme Court, Kings County, both entered July 20, 1981, reversed, on the law, with one bill of costs, determinations of the Department of Consumer Affairs confirmed, and proceedings dismissed on the merits, and it is declared that subdivision 5 of section B32-472.0 and section 773-13.0 of the Administrative Code of the City of New York are constitutional.