THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v GEORGE KETA, Defendant.

Supreme Court, Queens County, February 21, 1989

### APPEARANCES OF COUNSEL

*Mahler & Harris, P. C. (Stephen R. Mahler* of counsel), for defendant. *John J. Santucci, District Attorney (James E. Lamb* of counsel), for plaintiff.

### OPINION OF THE COURT

WILLIAM D. FRIEDMANN, J.

Defendant, charged with multiple counts of criminal possession of stolen property in the third degree (Penal Law

§ 165.50), moves to suppress evidence seized during a so-called "administrative search" of his business premises, that search being conducted pursuant to the Administrative Code of the City of New York and the New York State Vehicle and Traffic Law. Defendant also moves to suppress any statements made to the police following his arrest.

## DEFENDANT'S CONTENTIONS

Specifically, defendant, the operator of a licensed automobile dismantling business, seeks to suppress the following: (a) the physical evidence seized by police on February 17, 1988, when they conducted a warrantless search of his business premises; (b) the physical evidence seized on his business premises on February 17, 1988, during a later search executed pursuant to a search warrant; and (c) his statements to the police at the time of his arrest on February 17, 1988. The defendant contends that the statutes pursuant to which the search and seizure were executed are unconstitutional under provisions of the New York State Constitution.

## ISSUES BEFORE THE COURT

This court must first decide whether Vehicle and Traffic Law § 415-a (5) (a), pursuant to which a five-member team from the Auto Crime Division of the New York City Police Department executed a warrantless search of Jimmy & Son Auto Dismantlers, violates the provisions of NY Constitution, article I, § 12, which states in relevant part: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

This case also presents the following three questions: (1) whether a warrantless administrative search of an automobile dismantling operation executed pursuant to New York City Charter § 436 should be awarded legal approval; (2) should the fruits of a search of an auto dismantling business executed pursuant to the Vehicle and Traffic Law and New York City Charter § 436 be properly admitted into evidence; and (3) should the "fruits" of the search warrant and statements made by the defendant be suppressed as fruits of the illegal search and arrest.

## RELEVANT FACTS

This court conducted a combined *Mapp/Huntley* hearing on August 18, 1988. Police Officer Robert Baumert of the Auto Crime Division of the New York City Police Department testified. His testimony is found credible. Officer Baumert stated that on February 17, 1988 at approximately 3:30 P.M. a five-member team from the Auto Crime Division, under the command of Sergeant Wayne Grossnickle, went to 60-15 62nd Avenue in the Maspeth section of Queens County to perform a search of the auto dismantling operation, Jimmy & Son. According to Baumert, they chanced upon this dismantling business while conducting random inspections in the area.

The team went first to the front office in the fenced premises where they found the defendant, Mr. Keta, owner operator, seated at a desk. They requested, received and inspected the business' relevant licenses, certificates and permits. Officers Baumert and Gleason then proceeded out into the yard area to do a random sampling which involved the recording of vehicle identification numbers (hereinafter referred to as VINS) off auto parts in various sections of the yard. Five numbers were obtained. Upon entering the first two numbers into a digital computer, which was maintained in their radio car, the officers received information that these two parts were from automobiles that have previously been reported stolen.

Having discovered possible stolen goods, the officers returned to the defendant's front office to demand an inspection of the business' police book. They found that the suspect VINS had not been recorded. The parts were therefore seized and the officers placed the defendant under arrest at about 4:00 P.M. that day for possession of stolen property.

Officer Baumert further testified that this initial search was executed pursuant to Vehicle and Traffic Law § 415-a. After prodding by defense counsel, however, he admitted that in both his previous testimony to the Grand Jury and the affidavit subsequently submitted in support of an application for a search warrant, he had stated that the search was executed pursuant to New York City Charter §§ 435, 436 (sometimes hereinafter referred to as § 436).

Baumert alleged that both he and Officer Gleason read defendant his *Miranda* warnings subsequent to his arrest. After receiving these warnings, defendant is alleged to have agreed to answer questions which they posed to him. The

information which the defendant supplied while under arrest led, *inter alia,* to the subsequent arrest of two of his co-workers. Officer Baumert provided no evidence beyond his conclusory statements regarding the defendant's consent to answer questions after receiving his *Miranda* warnings. He did, however, produce his standard *Miranda* warnings card when asked on direct examination whether he had the particular questions which he used in the warnings. When queried by defense counsel as to whether the questions he used were in any way tailored to the needs of the specific situation, or whether the standard card was the exact one used, Officer Baumert responded that the standard card was, in fact, the exact form used.

At or about 5:30 P.M. Officers Baumert and Gleason left defendant in his office in the custody of their three teammates and went to obtain a search warrant. At approximately 8:00 P.M. they returned with a warrant which had been signed by Judge Lazarus of Queens County Criminal Court. The officers then executed a detailed search of the yard. (The yard was divided into quadrants by Sergeant Grossnickle and assigned.) This search yielded about 35 other parts of automobiles which at some point had also been reported stolen. Those parts along with the business police book were also seized by the search team. By 8:30 P.M., at the completion of the search, defendant was removed first to the 106th Precinct and from there to Central Booking, Queens. The seized items were taken to the Whitestone Pound and later vouchered at the 106th Precinct.

### CONCLUSIONS OF LAW

The People maintain that auto dismantlers are engaged in a pervasively regulated business. Thus, administrative searches of such operations fall within well-established exceptions to the warrant requirement. These warrantless administrative searches, the People assert, are in furtherance of a comprehensive State regulatory scheme aimed at reducing the number of thefts of automobiles within the State. *(See, New York v Burger,* 482 US 691 [1987].) The Governor of the State has deplored the auto-theft explosion which he has characterized as a multimillion dollar industry. (Governor's mem approving L 1979, chs 691, 692, 1979 McKinney's Session Laws of NY, at 1826-1827.)

The People's papers correctly observe that Vehicle and Traffic Law § 415-a and New York City Charter § 436, pursu-

ant to which the search in the instant case was conducted, have been the subject matter of many decisions by the courts of this State. They cite some of the more recent cases, such as *People v Burger* (112 AD2d 1046 [1985], *revd* 67 NY2d 338, *revd* 482 US 691, *appeal dismissed* 70 NY2d 828 [1986]; *People v Cusumano,* 108 AD2d 752) and an earlier decision rendered by this court in *People v Sullivan* (129 Misc 2d 747 [1985], *affd* 121 AD2d 663 [1986]).

Vehicle and Traffic Law § 415-a (5) (a), relied upon, states in pertinent part: "Any records required by this section shall apply only to vehicles or parts of vehicles for which a certificate of title has been issued by the commissioner or which would be eligible to have such a certificate of title issued. Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession. Such records shall be maintained in a manner and form prescribed by the commissioner. * * * Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises".

New York City Charter § 436 in relevant part states: "The commissioner shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers, vendors, junkshop keepers, junk boatmen, cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession".

It is further asserted that the vehicle dismantling business is part of three industries—the secondhand goods, junk, and motor vehicle industries. All three, the People suggest, are subject to pervasive government regulation. *(See, People v Cusumano, supra; People v Tinneny,* 99 Misc 2d 962.)

Both parties correctly note that Judge Alexander, writing

for the New York State Court of Appeals, held that sections 415-a and 436 both violated the constitutional proscriptions of the Fourth Amendment against unreasonable searches and seizures. That court went on to state that these statutes were fundamentally defective in that they authorize searches that are undertaken solely for the purpose of uncovering evidence of criminality, rather than enforcing a regulatory scheme. *(People v Burger, supra,* 67 NY2d, at 344-345.)

The People further contend that the United States Supreme Court held in *New York v Burger* (482 US 691, *supra)* that Vehicle and Traffic Law § 415-a (5) (a) and New York City Charter § 436 satisfy both the Federal and New York State constitutional provisions. This, they indicate, is "clearly" shown in footnotes 8, 10 and 13. *(Supra,* 482 US, at 697, 698, 703.) However, that conclusion is not equally clear to this court.*

This court notes the People's heavy reliance on *New York v Burger (supra)* in arguing for a decision in support of the constitutionality of the statutes in question. No doubt, *Burger* is an important component of the analysis which resolves the instant matter. Therefore, a correct reading of that case is a matter of great importance. Though the facts in *Burger* and in the case at bar bear striking similarities, a distinguishing feature is noted. In *Burger* the police officers asked the defendant, Mr. Burger, for his police book, as required by statute, prior to conducting the search of his yard. Burger informed them that he kept none. In the instant case, however, it was not until after the officers had searched Mr. Keta's premises and discovered stolen property that they asked to see defendant's police book.

This court understands that the constitutional challenge in *Burger (supra)* was based on US Constitution Fourth Amendment grounds. (Here, the defense bases its challenge on New York State constitutional grounds.) Moreover, on certiorari, reversing in part, the decision of the Court of Appeals, the Supreme Court held only Vehicle and Traffic Law § 415-a (5) (a) to be constitutional. *New York v Burger (supra)* has sparked several articles commenting on the infringement and government intrusion on private business. *(See,* Reich, *Admin-*

---

* It is apparent that the People have misconstrued the points conveyed in the footnotes which they have identified. Footnotes 8 and 10 do little more than offer glimpses into the prior history of the case on the State Supreme Court and appellate levels, respectively. Footnote 13 does not address the State Constitution.

*istrative Searches for Evidence of Crime: The Impact of New York v Burger,* 5 Touro L Rev 31 [draft, to be published in May 1989]; Fisher, *Is New York v. Burger a Threat to the Civil Liberties of Business?,* 60 [No. 2] NY St BJ 22 [Feb. 1988].) As footnote 13 itself states, the United States Supreme Court had "no reason to reach the question of the constitutionality of § 436 of the New York City Charter". *(New York v Burger, supra,* 482 US, at 703.)

On remand to the Court of Appeals, where the case could have been reconsidered on New York State constitutional grounds, the People's motion was granted and the case was dismissed without comment. That court found that the defendant was not available to obey its mandate in the event of affirmance. *(People v Burger,* 70 NY2d 828, *supra.)* Herein lies, in part, the reason for this court's convictions regarding the importance of *Burger* and its relevance to this case. Given the procedural history of *Burger,* this court views the holding of the Court of Appeals with respect to section 436 to be the controlling law in this State. A determination yet remains to be reached on the basis of the New York State Constitution by the New York Court of Appeals or Appellate Division (the Appellate Term of the New York Supreme Court has held that the Court of Appeals holding of unconstitutionality still holds). *(People v Lopez,* NYLJ, Nov. 18, 1987, at 13, col 3 [2d and 11th Judicial Dists].)

Another recent decision by the Court of Appeals significantly aids this continuing analysis. In *People v Class* (97 AD2d 741 [1983], *revd* 63 NY2d 491 [1984], *revd* 475 US 106, *on remand* 67 NY2d 431 [1986]), the Court of Appeals reversed the lower court's decision and held that the entry of a police officer into defendant's car and his shuffling of papers on the dashboard in order to read the VIN—obscured from view from the outside—was an unlawful search and therefore unconstitutional on both State and Federal grounds. The Supreme Court reversed with respect to the Fourth Amendment finding and remanded the case to be reconsidered on State constitutional grounds. In the absence of any "plain statement" to the contrary, the Supreme Court noted that the analysis set forth in the opinion of the Court of Appeals lacked an adequate and independent State ground. *(New York v Class,* 475 US 106, 109 [1986].) Quoting from *Michigan v Long* (463 US 1032, 1040-1041), the Supreme Court asserted: " '[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the

adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.' " *(New York v Class, supra,* at 110.)

The dissimilarity of the facts in *Class (supra),* to those of the instant case notwithstanding, the law enunciated therein is fraught with implications for the conclusions that are reached here. Upon reconsidering *People v Class (supra),* the Court of Appeals noted that whereas, as a matter of State law, on remand, Supreme Court decisions had been followed in several cases in the past, the State Constitution was not initially and expressly relied upon in any of those previous cases. With a gesture marked by jurisprudential boldness, the court then set forth quite a novel and useful standard of review. Having already held on the original appeal that the State Constitution had been violated, the court declined to reach any different result following reversal on Federal constitutional ground. The Court of Appeals stated that there needed to be a demonstration on the part of the People that extraordinary or compelling circumstances warranted such different result. In the court's assessment, that burden had not been met.

One fundamental premise of our Federal system is that the States are the primary guardians of the liberty of the people. Enormous importance is attached to the fact that as a political act under our system, two separate Constitutions were adopted—neither expressly superseding the other—and two have endured. Indeed, it is usual for States to generally follow the mandates handed down by the United States Supreme Court. *(See,* US Const, art VI, cl [2]; *Marbury v Madison,* 1 Cranch [5 US] 137 [1803].) However, a study of New York State cases between 1960 and 1978 has also shown a readiness on the part of the courts of this State to recognize the independent value of the State's constitutional traditions and to decide matters in a manner consistent with that recognition. *(See,* Galie, *State Constitutional Guarantees and Protection of Defendants' Rights: The Case of New York, 1960-1978,* 28 Buffalo L Rev 157, 192 [1979]; *see also,* Kramer and Riza, *The United States Supreme Court, 1960-1976,* 8 Publius 75 [1978].) Moreover, in *Oregon v Hass* (420 US 714), the Supreme Court itself established a predicate by which States' high courts, through their discretion, may use State Constitutions to expand protections for their citizens, beyond those held to be necessary under the Federal Constitution. *(See also, Michi-*

*gan v Long,* 463 US 1032; *PruneYard Shopping Center v Robins,* 447 US 74; *Sibron v New York,* 392 US 40.)

Where, as in the instant case, no textual difference occurs between the State and Federal prohibitions of unreasonable searches and seizures, as a juridical act, a constitutional analysis must not stop with a mechanical matching of texts. Otherwise, significant proctections of the State Constitution would be relegated to redundancy. *(See,* Kaye, *Dual Constitutionalism in Practice and Principle,* 42 Record of Assn of Bar of City of NY 285 [Apr. 1987].) As the Court of Appeals noted recently in *People v P. J. Video* (68 NY2d 296, 304 [1986]), the interest of uniformity is only "one consideration to be balanced against other considerations that may argue for a different State rule. When weighed against the ability to protect fundamental constitutional rights, the practical need for uniformity can seldom be a decision factor". *People v Class (supra)* represents the most recent and boldest demonstration of resolve on the part of this State's highest court to respect and jealously protect the rights of its individual citizens by relying on State, rather than on more narrowly interpreted Federal grounds. In light of *Class (supra)* and the earlier finding of the Court of Appeals in *Burger (supra),* this court shares the instincts of the defense. Had the *Burger* Court of Appeals been allowed the opportunity to decide on both the Vehicle and Traffic Law and New York City Charter § 436 strictly on State constitutional ground, it is difficult to imagine that its holding would have been, essentially, any different than it is in *Class. (See,* Bellacosa, *A New York State Constitution Touch of Class,* 59 [No. 3] NY St BJ 14 [Apr. 1987].)

Consistent with the reasoning as set forth above, this court therefore holds that New York City Charter § 436 and Vehicle and Traffic Law § 415-a (5) (a) are violative of the constitutional protections extended to the citizens of this State through NY Constitution, article I, § 12.

### *HUNTLEY* AND MOTION TO CONTROVERT THE SEARCH

The court finds that the statements allegedly made by the defendant and the search conducted by the police pursuant to a search warrant were as a by-product of the illegal search and seizure and must be suppressed as fruits of the poisonous tree. Therefore, all of the motions presented by the defense are hereby granted.