THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE KETA, Respondent.

Second Department, February 19, 1991

174

## APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Michael O'Brien* of counsel), for appellant.

*Mahler & Harris, P. C. (Stephen R. Mahler* of counsel), for respondent.

## OPINION OF THE COURT

KOOPER, J.

■ The issue before us is whether Vehicle and Traffic Law § 415-a (5) (a), having previously withstood challenge on Federal constitutional grounds, is nevertheless unconstitutional under NY Constitution, article I, § 12. We conclude that it is not, and reverse the order appealed from.

### I.

On February 17, 1988, at approximately 3:30 P.M., Police Officer Robert Baumert and other police officers arrived at the Jimmy-Son vehicle dismantling yard, which was owned by the defendant, George Keta. Officer Baumert, a member of the Automobile Crime Division of the New York City Police Department, testified that the defendant's yard, together with another nearby establishment, had been randomly selected for inspection that day. According to Officer Baumert, he and other members of the inspection team walked into the office, identified themselves as police officers and announced that they were present to perform an administrative inspection. Upon the officers' request, the defendant produced various New York City permits and his vehicle dismantler's license. The officers recorded the license and permit numbers and then entered the yard, randomly selecting vehicle identification

numbers from several parts on the premises which were located in open sheds covered from above but with no doors or siding. After entering the numbers into a computer located in their patrol car, the officers discovered that some of the parts were from automobiles which had been reported stolen.

Since it was "not uncommon" to receive a "hit" on an automobile part (i.e., to learn that the part has been reported as stolen), Officer Baumert and a fellow officer returned to the office and requested that the defendant produce his so-called "police book", in which entries relating to the purchase of a vehicle part must be recorded by a vehicle dismantler pursuant to Vehicle and Traffic Law § 415-a (5) (a).[1] After ascertaining that the defendant's "police book" did not contain the required entries pertaining to the stolen parts, the defendant was placed under arrest. Later that evening, Officer Baumert obtained a search warrant, and upon executing the warrant, discovered some 35 stolen automobile parts in the yard. The defendant was thereafter charged, *inter alia,* with criminal possession of stolen property in the third degree, grand larceny and falsifying business records in the second and third degrees.

## II.

The hearing court subsequently granted the defendant's motion to suppress, determining that Vehicle and Traffic Law § 415-a (5) (a) was violative of NY Constitution, article I, § 12. The hearing court observed that in *People v Burger* (67 NY2d 338, *revd sub nom. New York v Burger,* 482 US 691), the Court of Appeals struck down Vehicle and Traffic Law § 415-a (5) (a)

---

1. Vehicle and Traffic Law § 415-a (5) (a) provides, in part: "5. Records and identification. (a) * * * Every person required to be registered pursuant to this section shall maintain a record of all motor vehicles, trailers, and major component parts thereof, coming into his possession together with a record of the disposition of any such motor vehicle, trailer or part thereof and shall maintain proof of ownership for any motor vehicle, trailer or major component part thereof while in his possession. Such records shall be maintained in a manner and form prescribed by the commissioner. * * * Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises. * * * The failure to produce such records or permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor."

on Federal constitutional grounds. In striking down the statute, the Court of Appeals determined that, while Vehicle and Traffic Law § 415-a (5) (a) permissibly authorized "inspectors to make unannounced visits to regulated premises to examine required books and records" *(People v Burger, supra,* at 344) it nevertheless failed to satisfy the constitutional requisites for a valid comprehensive regulatory scheme since the statute permitted searches "notwithstanding the absence of any records against which the findings of such a search could be compared" *(People v Burger, supra,* at 345). The Court of Appeals concluded that "[t]he fundamental defect [of Vehicle and Traffic Law § 415-a (5) (a)] is that [it] authoriz[es] searches undertaken solely to uncover evidence of criminality and not to enforce a comprehensive regulatory scheme" *(People v Burger, supra,* at 344).[2]

In reversing the Court of Appeals' holding, the United States Supreme Court focused on the Court of Appeals' concern that Vehicle and Traffic Law § 415-a (5) (a) was merely an expedient means of enforcing penal, rather than administrative violations, by observing that, "a State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions" *(New York v Burger,* 482 US 691, 712, *supra).* The Supreme Court further explained that, "[a]dministrative statutes and penal laws may have the same *ultimate* purpose of remedying the social problem, but they have different subsidiary purposes and prescribe different methods of addressing the problem" *(New York v Burger, supra,* at 712). The court found that Vehicle and Traffic Law § 415-a (5) (a) served the legitimate regulatory goal of ensuring that vehicle dismantlers are legitimate businessmen and that the parts which they sell can be traced and identified *(see, New York v Burger, supra,* at 714-715). The statute was not

2. In *People v Burger* (67 NY2d 338, *supra),* the arresting officers conducted an inspection of the defendant's yard even though they had ascertained prior to the inspection that the defendant had not maintained records required under the statute. It should be noted that in *Burger* the Court of Appeals also found New York City Charter § 436 to be unconstitutional on grounds similar to those identified by it in striking down Vehicle and Traffic Law § 415-a (5) (a) *(see, People v Burger, supra,* at 344-345). Although, at bar, one of the arresting officers testified before the Grand Jury that the inspection was also conducted pursuant to New York City Charter § 436, our conclusion with respect to the constitutionality of Vehicle and Traffic Law § 415-a (5) (a) obviates the need to consider the application of the New York City Charter *(see, New York v Burger,* 482 US 691, 698, *supra).*

unconstitutional, the Supreme Court reasoned, merely because its administrative objectives may coincide with those sought to be achieved by penal statutes or because in permissibly administering the regulatory scheme, an officer may uncover violations of the Penal Law *(see, New York v Burger, supra,* at 716). The Supreme Court further determined that the vehicle dismantling business had been subjected to "pervasive" regulation *(see, New York v Burger, supra,* at 702), and thereafter held that: (1) a substantial governmental interest "inform[ed] the regulatory scheme pursuant to which the inspection is made" *(New York v Burger, supra,* at 702), (2) the warrantless inspections were necessary to further the regulatory scheme, and (3) the statute reasonably limited the discretion of the inspectors in time, place and scope *(see, New York v Burger, supra,* at 709-714). Accordingly, the Supreme Court concluded that the warrantless inspection of commercial premises authorized under Vehicle and Traffic Law § 415-a (5) (a) was reasonable within the meaning of the Fourth Amendment.

In considering the application of the identically worded provision of the New York State Constitution, the hearing court declined to adopt the Supreme Court's holding in the *Burger* case *(supra).* In support of its determination that Vehicle and Traffic Law § 415-a (5) (a) was violative of the New York State Constitution, the hearing court reasoned, *inter alia,* that in the past, the Court of Appeals had demonstrated its inclination to expand the right of citizens by "relying on State, rather than on more narrowly interpreted Federal grounds" *(People v Keta,* 142 Misc 2d 986, 994), and that such an expansive interpretation was appropriate under the circumstances presented here. We disagree and find no constitutional infirmity in the challenged statute.

## III.

■ As a threshold matter, the hearing court's holding with respect to the scope of the State Constitution impinges upon the policy and rule-making function traditionally perceived as the exclusive domain of the Court of Appeals *(see generally,* Hopkins, *The Role of An Intermediate Appellate Court,* 41 Brooklyn L Rev 459, 460 [1974-1975]). Where, as here, "noninterpretative", State-wide policy considerations govern, in part, any inquiry into the existence of enhanced protection by the State Constitution *(see, People v Alvarez,* 70 NY2d 375, 379), we must temper our actions with restraint in deference to the

Court of Appeals' role as the State's policy-making tribunal. This is particularly so where the hearing court discerns in the State Constitution rights which we ourselves have twice declined to recognize when examining the statute under the identically worded provision of the Federal Constitution *(see, People v Burger,* 112 AD2d 1046, *revd* 67 NY2d 338, *revd* 482 US 691, *supra; People v Cusumano,* 108 AD2d 752). In short, the Court of Appeals is best suited to effectively weigh the policy concerns which must be considered in order to determine whether the recognition of a separate right under the State Constitution is, in fact, required.

## IV.

Turning to the substantive issue at hand, a review of relevant holdings by the Court of Appeals discloses that a determination to depart from a recently enunciated Federal constitutional standard is cautiously undertaken *(see, People v Reynolds,* 71 NY2d 552, 557), and only after serious consideration of the competing interests involved. Although the court has, in the past, construed the New York State Constitution as providing greater protections than those afforded by the Federal Constitution *(see, e.g., People v Dunn,* 77 NY2d 19; *People v Vilardi,* 76 NY2d 67; *People v Torres,* 74 NY2d 224; *People v P. J. Video,* 68 NY2d 296, *cert denied* 479 US 1091; *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57), it does not "disregard the Supreme Court's decisions merely because it disagrees with them or dislikes the result reached" *(People v Vilardi, supra,* at 80 [Simons, J., concurring]; *People v Alvarez, supra; see also, Golden v Clark,* 76 NY2d 618). Rather, the court's holdings reflect a careful balancing process, in which the historical significance and local character of the right in question is weighed against, among other things, the desirability of consistency and uniformity in constitutional jurisprudence *(see, Golden v Clark, supra* [Hancock, Jr., J., dissenting]; *People v P. J. Video, supra; People v Alvarez, supra).* Although the Court of Appeals has always tempered the exercise of its "independent judgment" in such matters by considering "sound policy, justice and fundamental fairness" *(People v P. J. Video, supra,* at 303; *see, People v Alvarez, supra,* at 378-379), it has also emphasized the important practical considerations of maintaining " 'bright line' rules to guide the decisions of law enforcement and judicial personnel who must understand and implement * * * decisions in their day-to-day opera-

tions in the field" *(People v P. J. Video, supra,* at 305; *see, People v Alvarez, supra,* at 379).

■ The court itself has described its constitutional inquiry as more circumspect in the area of Fourth Amendment rights due to the identity of language in the Federal and State Constitutions. In this respect the court has observed that, "[o]ur conduct in the area of Fourth Amendment rights has been somewhat more restrained because the history of section 12 supports the presumption that the provision 'against unlawful searches and seizures contained in NY Constitution, article I, § 12 conforms with that found in the 4th Amendment, and that this identity of language supports a policy of uniformity between State and Federal Courts' " *(People v P. J. Video, supra,* at 304, quoting *People v Johnson,* 66 NY2d 398, 406). More particularly, the court has stated that where there is an identity in the textual content of the State and Federal Constitutions, a so-called " 'noninterpretative analysis' " *(People v Alvarez,* 70 NY2d 375, 378, *supra)* must be undertaken, requiring consideration of, *inter alia,* whether the "right at issue has historically been afforded greater protection in New York than is presently required under the Federal Constitution, whether the right is 'of peculiar State or local concern,' or whether the State citizenry has 'distinctive attitudes' toward the right" *(People v Alvarez, supra,* at 379, quoting *People v P. J. Video, supra,* at 303).

■ In his concurring opinion in the court's recent *Vilardi* opinion, Judge Simons concisely summarized the circumstances under which the court has applied the State Constitution by noting that, "[i]n the past when we have departed from the Supreme Court's decisions, we generally have done so because (1) we chose to adhere to our own established law or because the Supreme Court has retreated from previously announced rules * * * (2) to establish a more protective State right by constitutionalizing a prior fully developed common-law right * * * or (3) because we have found a separate State rule justified by concerns peculiar to New York State residents" *(People v Vilardi,* 76 NY2d 67, 83, *supra* [Simons, J., concurring]). An analysis of the foregoing considerations fails to support the conclusion that an expansive construction of the New York State Constitution is warranted under the circumstances.

Significantly, the constitutional right in question differs materially from those which the Court of Appeals has singled out as meriting special protection under the provisions of the

New York State Constitution. Those cases in which the court has discerned the existence of greater protections under the State Constitution have involved fundamental rights which have been historically accorded a higher status in New York and which affect a broad spectrum of the State's citizenry *(see, e.g., Matter of Beach v Shanley,* 62 NY2d 241, 255 [Wachtler, J., concurring] [New York has historically valued freedom of speech, "as is exemplified by the acquittal in 1735 of John Peter Zenger"]; *People v Harris,* 77 NY2d 434, 439 [right to counsel " 'cherished principle', rooted in this State's prerevolutionary constitutional law"]; *Immuno, A.G. v Jan Moor-Jackowski,* 77 NY2d 235, 248-250; *see also, People v Vilardi, supra; People v Torres,* 74 NY2d 224, *supra; O'Neill v Oakgrove Constr.,* 71 NY2d 521, 531 [Kaye, J., concurring]; *People v P. J. Video,* 68 NY2d 296, *cert denied* 479 US 1091, *supra; People ex rel. Arcara v Cloud Books,* 68 NY2d 553, 557; *People v Johnson,* 66 NY2d 398, *supra; cf., Golden v Clark,* 76 NY2d 618, 632, n 2, *supra* [Hancock, Jr., J., dissenting]). Here, the challenged enactment affects only a relatively small number of commercial establishments operating businesses within an industry which the Legislature has found to be influenced by the multimillion-dollar trade in stolen automobiles and parts *(cf., People v Pace,* 101 AD2d 336, 342-343 [Mangano, J., dissenting], *affd* 65 NY2d 684 ["(t)he junkyard and vehicle dismantling industries have also long been subject to government supervision and inspection due to legislative findings that the crimes of possession of stolen property in general and stolen automobile parts, in particular, are pervasive in those industries"]). Moreover, nothing in the record suggests that the provisions of Vehicle and Traffic Law § 415-a (5) (a) implicate a " 'peculiar State or local concern' " *(People v Alvarez,* 70 NY2d 375, 379, *supra,),* or that the rights of a vehicle dismantler under the circumstances have been historically accorded greater protection in New York than that which would be presently afforded under the Supreme Court's *Burger* holding. Indeed, the enactment of the regulatory scheme by our own State Legislature—and the legislative findings that automobile theft rings have flourished in New York—strongly militate against any suggestion that there exists a distinctive local attitude or concern warranting the extension of additional constitutional protections to those who engage in the vehicle dismantling business.[3] Accordingly, the

---

**3.** The legislative memorandum drafted in connection with Vehicle and

defendant has failed "to demonstrate how the * * * provisions [of the State Constitution] * * * establish any more or greater rights than those guaranteed to the citizens of New York by the Federal Constitution" *(Golden v Clark, supra,* at 623, n 2; *People v Reynolds,* 71 NY2d 552, *supra; People v Alvarez, supra; cf., Savastano v Nurnberg,* 77 NY2d 300, 307-308, n 7; *Sinhogar v Parry,* 53 NY2d 424, 433, n 5).

■ Nor do we believe that the Supreme Court's *Burger* rationale constitutes a departure from that which it had previously applied where the propriety of an administrative search has been assessed *(see, Donovan v Dewey,* 452 US 594; *United States v Biswell,* 406 US 311; *Colonnade Corp. v United States,* 397 US 72). Although the dissenters in the Supreme Court's *Burger* decision took issue with, *inter alia,* the majority's factually premised conclusion that the vehicle dismantling industry was "pervasively regulated" *(New York v Burger,* 482 US 691, 718, *supra* [Brennan, J., dissenting]), the majority's holding in this respect can hardly be described as signalling a doctrinal revision or departure from the court's previously enunciated standards governing warrantless administrative searches *(see, e.g., United States v Biswell, supra; cf., People v Vilardi,* 76 NY2d 67, *supra).* Indeed, the Court of Appeals itself declined to describe the vehicle dismantling

Traffic Law § 415-a (5) (a) reveals that the framers' objective in enacting the statute was to "provide a system of record keeping so that vehicles can be traced through junk yards and to assure that such junk yards are run by legitimate business men rather than by auto theft rings" (mem of State Dept of Motor Vehicles in relation to L 1973, ch 225, 1973 NY Legis Ann, at 287, 288). Moreover, in prefacing a comprehensive report on automobile theft issued in 1978 by the State Senate Committee on Transportation, Senator John D. Caemmerer, Chairman of the Committee, stated that the "automobile theft rate in New York State has reached horrendous proportions", and further noted that, "[c]ontrary to national trends, the auto theft rate in New York continues to increase," constituting "10% of the national auto theft total" (letter of Sen John D. Caemmerer to Sen Warren M. Anderson, dated Jan. 16, 1978, in Auto Thefts: A Low Risk High Profit Crisis in New York State, Report of NY St Senate Comm on Transp [hereinafter Auto Theft Report], on file with NY State Legis Reference Lib). The Committee noted a 14% increase in reported thefts between 1975 and 1976 alone, and concluded that the New York metropolitan area, in particular, had been targeted by professional automobile thief rings *(see,* Auto Theft Report, *op. cit.,* at 1). Significantly, in approving certain amendments to the statute in 1979, Governor Hugh L. Carey observed that over 130,000 automobiles had been stolen in 1976, and that "[m]otor vehicle theft * * * has become a multimillion dollar industry which has resulted in an intolerable economic burden for the citizens of New York" (Governor's mem on approving L 1979, ch 691, 1979 NY Legis Ann, at 416).

industry as one *not* subject to pervasive regulation. To the contrary, the courts—including this one—have been virtually unanimous in concluding that the vehicle dismantling industry has, in fact, been subjected to pervasive regulation *(see, People v Cusumano,* 108 AD2d 752, 753, *supra; People v Tinneny,* 145 Misc 2d 737; *People v Leto,* 124 Misc 2d 549; *People v Camme,* 112 Misc 2d 792, 794-795; *People v Pace,* 101 AD2d 336, 343-344 [Mangano, J., dissenting], *affd* 65 NY2d 684, *supra; People v Tinneny,* 99 Misc 2d 962; *cf., Alliance of Am. Insurers v Chu,* 77 NY2d 573, 605, n 10 [Apr. 2, 1991] [Hancock, Jr., J., dissenting]; *People v Lopez,* NYLJ, Nov. 18, 1987, at 13, col 3). There is also precedent supporting the assertion that even prior to the enactment of Vehicle and Traffic Law § 415-a (5) (a), vehicle dismantlers had long been subject to administrative and statutory regulation in New York *(see, People v Tinneny,* 99 Misc 2d 962, 969, n 2, *supra; cf.,* General Municipal Law § 136; *see also, New York v Burger,* 482 US 691, 703-707, *supra).* Moreover, prior to its *Burger* decision, the Supreme Court had upheld the regulatory scheme associated with the Federal Gun Control Act, and sanctioned statutory provisions requiring a gun dealer to submit to an unspecified number of warrantless administrative searches and the inspection of records "during business hours" *(United States v Biswell, supra,* at 312, n 1). Accordingly, we discern no break from prior precedent in the Supreme Court's *Burger* conclusion that the statutory scheme at issue here—which also authorizes searches during business hours—sufficiently defines the scope of any inspection and reasonably limits the discretion of the inspecting officer *(see, New York v Burger, supra,* at 711-712; Vehicle and Traffic Law § 415-a [5] [a]). Further, other administrative schemes—the Federal Gun Control Act in particular—were enacted with the objective of discouraging criminal conduct and have nevertheless been upheld as legitimately regulatory in character *(see, United States v Biswell, supra).* Indeed, even the dissenting Justices in the Supreme Court's *Burger* decision agreed that a State may address a major social problem, such as automobile theft, through the enactment of *both* an administrative scheme and penal sanctions *(see, New York v Burger, supra,* at 727 [Brennan, J., dissenting]).

■ Finally, it bears noting that the circumstances surrounding the regulatory inspection conducted at bar differ materially from those in *Burger.* Here, the defendant maintained a "police book", which the officers permissibly requested and

examined upon their arrival at his yard. After determining, by random computer check, that certain parts on the premises registered as stolen on their equipment, the officers then examined the defendant's records in order to ascertain if these parts had been inventoried in conformity with the regulatory scheme. Only when the officers determined that the parts had not been properly inventoried was the defendant arrested. Thereafter, a search warrant predicated upon the existence of probable cause was obtained so as to facilitate a further and more thorough inspection of the premises. Contrary to the dissenters' contentions, the conduct of the officers in first requesting the defendant's "police book", then briefly inspecting his inventory, and then finally, reexamining the "police book" in order to ensure that the proper entries had been made, amply establishes the administrative character of the encounter and undermines the suggestion that the defendant was subjected to an inspection motivated solely by a desire to uncover evidence of Penal Law violations. Indeed, when the officers ultimately confirmed that the defendant had allegedly committed violations of the Penal Law, they properly obtained a warrant before conducting a further search of his yard.

In short, neither the policy concerns applicable to the present inquiry nor the considerations of fundamental fairness from which they proceed (see, People v Alvarez, 70 NY2d 375, 379, supra), predominate so as to counterbalance the desirability of consistency and uniformity in constitutional construction (see, People v Reynolds, 71 NY2d 552, 557, supra). Accordingly, we conclude that the regulatory scheme created by Vehicle and Traffic Law § 415-a (5) (a) comports with relevant constitutional requisites and we reverse the order appealed from, deny the branch of the defendant's omnibus motion which was to suppress physical evidence and statements made by him to law enforcement officials, and remit the matter to the Supreme Court, Queens County, for further proceedings consistent herewith.

HARWOOD, J. (dissenting).

I dissent and vote to affirm the order from which the People appeal. I do not agree with the majority's suggestion that an intermediate appellate court, the court of last resort in a majority of cases and only one of the functions of which is error-correcting (see, Hopkins, The Role of an Intermediate Appellate Court, 41 Brooklyn L Rev 459, 460, 475, 478 [1974-1975]), should reverse a determination by a hearing court

presiding over a criminal case that evidence should be suppressed, primarily as a matter of "deference to the Court of Appeals' role as the State's policy-making tribunal". It is my view that in cases where, as here, an issue of State constitutional law is raised and presented in a proper procedural posture, a court called upon to address the merits is bound to do so. As a matter of substance, I do not share the majority's view that police conduct which would not pass constitutional muster in the context of the criminal law (see, People v Pace, 101 AD2d 336, affd 65 NY2d 684) becomes permissible when the police are cloaked by statute in "administrative" garb just because the criminal problem—in this case auto theft—which that statute was intended to address has become an acute one. It is my view, rather, that the right to be free of unreasonable governmental searches and seizures was intended to be honored even where the fruits of an unlawful search would otherwise be useful in a criminal prosecution and even where the number of citizens affected by the particular police conduct is, for the present, relatively small.

The facts surrounding the challenged "inspection" as set forth by the majority do not need repetition here. I note in addition, however, that, according to Police Officer Baumert, the only witness to testify at the suppression hearing, the "job" of the five-member police team making the random inspections of vehicle dismantling businesses and junkyards was "to detect and to prevent ongoing auto crime in the City of New York". I also note that notwithstanding the ostensible "administrative" purposes of Vehicle and Traffic Law § 415-a (5) (a)[1] and New York City Charter § 436,[2] there were no

---

1. As the majority notes, Vehicle and Traffic Law § 415-a (5) (a) provides in pertinent part: "[u]pon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises. * * * The failure to produce such records or to permit such inspection on the part of any person required to be registered pursuant to this section as required by this paragraph shall be a class A misdemeanor."

2. By virtue of New York City Charter § 436, the Commissioner of Police "shall possess powers of general supervision and inspection over all licensed or unlicensed pawnbrokers, vendors, junkshop keepers, junk boatment [sic], cartmen, dealers in second-hand merchandise and auctioneers within the city; and in connection with the performance of any police duties he shall have power to examine such persons, their clerks and employees and their books, business premises, and any articles of merchandise in their possession. A refusal or neglect to comply in any respect with the provisions of

administrative consequences to the defendant, who produced a "police book" and who permitted inspection of his records and premises in accordance with the "administrative" legislation. He was instead charged with violations of the Penal Law, including multiple counts of criminal possession of stolen property in varying degrees, theft of one automobile registration via one count of grand larceny in the third degree, damaging certain parts of some automobiles via two counts of criminal mischief in the second degree, possession of defaced license plates via three counts of illegal possession of a vehicle identification plate, and falsifying business records in the first and second degrees. Interestingly, he was also indicted for possession of burglar's tools, a crime concerning items beyond the scope of those items which can be "inspected" pursuant to the "administrative" statute the majority upholds today. Moreover, although the majority attributes significance to the fact that the defendant was arrested only after the police examined his records and determined that auto parts in his possession which the police had just learned were reported stolen had not been "inventoried in conformity with the regulatory scheme", I regard that fact as irrelevant. Indeed, the implication that, had the defendant kept thorough records of the stolen automobile parts, the police would have concluded their "administrative" business and gone on to other establishments, defies common sense. In short, unlike valid administrative inspections designed to further a scheme promoting, e.g., health and safety, and in spite of the record-keeping and licensing requirements which provide an administrative gloss for the underlying goal of the challenged legislation, the inspections which the legislation authorizes do nothing more than enable police to ferret out crime.

It has long been recognized that the Fourth Amendment prohibition against unreasonable governmental searches and seizures protects commercial premises as well as private homes and it applies in both civil and criminal contexts (see, e.g., Marshall v Barlow's, Inc., 436 US 307; See v City of Seattle, 387 US 541). It has also heretofore been recognized that, in circumspect classes of cases involving industries which are pervasively regulated, administrative searches are excepted from the general rule requiring warrants issued on

this section * * * shall be triable by a judge of the criminal court and punishable by not more than thirty days' imprisonment, or by a fine of not more than fifty dollars, or both."

probable cause, provided, *inter alia,* the search itself is part of a regulatory scheme designed to further an urgent administrative interest *(see, e.g., Donovan v Dewey,* 452 US 594; *United States v Biswell,* 406 US 311). These " 'carefully defined classes of cases' " *(see, Marshall v Barlow's, Inc., supra,* at 312, quoting *Camara v Municipal Ct.,* 387 US 523, 528-529) are "indeed exceptions" to the Fourth Amendment prohibition against warrantless searches and seizures *(see, Marshall v Barlow's, Inc., supra)* and otherwise proper warrantless administrative inspections of commercial property may in any event be constitutionally objectionable if the inspections are so random, infrequent or unpredictable that, e.g., the "inspectors" have virtually unbridled discretion as to whom to search and when *(see, Donovan v Dewey,* 452 US 594, *supra; Marshall v Barlow's, Inc., supra).*

In *People v Burger* (67 NY2d 338, *revd* 482 US 691), the highest court of this State expressed its recognition of these principles and in light of them ruled that both Vehicle and Traffic Law § 415-a (5) (a) and New York City Charter § 436 were violative of the Fourth Amendment because, *inter alia,* they did little more than authorize general searches by police of certain commercial premises, not to further any administrative or regulatory purpose but rather solely to uncover evidence of criminality *(see, People v Burger, supra,* at 344). As noted by the majority, "[t]he fundamental defect in the statutes before us is that they authorize searches undertaken solely to uncover evidence of criminality and not to enforce a comprehensive regulatory scheme. The asserted 'administrative schemes' here are, in reality, designed simply to give the police an expedient means of enforcing penal sanctions for possession of stolen property. Furthermore, an otherwise invalid search of private property is not rendered reasonable merely because it is authorized by a statute, for to so hold would allow legislative bodies to override the constitutional protections against unlawful searches" *(People v Burger, supra,* at 344).

The United States Supreme Court reversed *(New York v Burger,* 482 US 691, *supra)* and, in an apparent departure from earlier precedents, held that statutorily authorized warrantless searches of closely regulated businesses were reasonable within the meaning of the Fourth Amendment if the regulatory scheme was designed to further a substantial State interest *(see, Donovan v Dewey,* 452 US 594, *supra; United States v Biswell,* 406 US 311, *supra)* and that a statute

authorizing a search was sufficiently limited in time and scope if it restricted searches of records and items to business hours, notwithstanding that no guidelines are set forth as to which, and how often, premises were to be searched (*cf., Marshall v Barlow's, Inc.,* 436 US 307, *supra*). Significantly, although it has previously ruled that commercial property may not, without a warrant, be entered to conduct a search for contraband or evidence of crime (*see, e.g., Donovan v Dewey, supra,* at 598, n 6; *Camara v Municipal Ct.,* 387 US 523, *supra; Michigan v Tyler,* 436 US 499), the court also held that an administrative scheme "may have the same *ultimate* purpose" as penal laws (*New York v Burger, supra,* at 712 [emphasis in original]) without impermissibly becoming a warrantless tool for the gathering of evidence for criminal prosecution (*see, New York v Burger, supra*). The court concluded that Vehicle and Traffic Law § 415-a (5) (a) which, it recognized, was enacted because the crime of automobile theft had become a significant social problem (*see, New York v Burger, supra,* at 708), satisfied the applicable tests and it deemed it unnecessary to reach the issue of whether the inspections authorized by New York City Charter § 436 were also reasonable within the meaning of the Fourth Amendment (*see, New York v Burger, supra,* at 703, n 13). On remand, the Court of Appeals granted the People's motion to dismiss the appeal because the defendant Burger was not available to obey its mandate in the event of an affirmance (*see, People v Burger,* 70 NY2d 828), thus leaving unresolved the question which was not before this court when it decided *People v Cusumano* (108 AD2d 752; *see also, People v Burger,* 112 AD2d 1046, *revd* 67 NY2d 338, *revd* 482 US 691, *supra*), but which is squarely presented by this appeal, i.e., whether legislatively authorized warrantless searches of premises where vehicle dismantling businesses are operated is violative of our State Constitution.

The People urge and the majority accepts that, in light of the identity of language guaranteeing the right to be secure against unreasonable searches and seizures contained in the Fourth Amendment and in NY Constitution, article I, § 12, we should adhere to a "policy of uniformity" between State and Federal courts (*cf., People v Johnson,* 66 NY2d 398, 406; *see, People v Gonzalez,* 62 NY2d 386; *People v Ponder,* 54 NY2d 160) and uphold as against the State Constitution Vehicle and Traffic Law § 415-a (5) (a). Identity of language, however, "does not spell the end of state judicial review" of its own constitution (Kaye, *Dual Constitutionalism in Practice & Principle,* 61

St. John's L Rev 399, 420 [1986-1987]; *see generally, People v Harris,* 77 NY2d 434). Indeed, the Federal Constitution, of which the United States Supreme Court is the final interpreter *(see, People v P. J. Video,* 68 NY2d 296, 302-303, *cert denied* 479 US 1091), provides the floor below which no State may fall in protecting individual rights but above which it may rise *(see, Oregon v Hass,* 420 US 714, 719; *see also,* Kaye, *Dual Constitutionalism in Practice & Principle, op. cit.,* at 420). In that regard, New York courts have not hesi- tated to give this State's prohibition against unreasonable searches and seizures broader application than its Federal counterpart *(see, e.g., People v Torres,* 74 NY2d 224; *People v P. J. Video, supra; People v Class,* 67 NY2d 431; *People v Johnson, supra; People v Gokey,* 60 NY2d 309, 312; *cf., People v Fata,* 159 AD2d 180), particularly "when doing so best pro- motes 'predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens' " *(People v P. J. Video, supra,* at 304, quoting *People v Johnson, supra,* at 407; *see also, People v Torres, supra,* at 228) or when the Federal floor has been lowered by a departure from precedent *(see, e.g., People v Bigelow,* 66 NY2d 417; *see also, People v Torres, supra; People v P. J. Video, supra,* at 305; *cf., People v Belton,* 55 NY2d 49).

I regard the Supreme Court's holding in *New York v Burger* (482 US 691, *supra)* as a departure from its prior rulings that warrantless administrative searches are unlawful when used to uncover evidence of criminality *(see, e.g., Donovan v Dewey,* 452 US 594, 598, n 6, *supra)*. Moreover, since lawful warrant- less "administrative" searches were heretofore "indeed excep- tions" to Fourth Amendment proscriptions, I regard invalida- tion of Vehicle and Traffic Law § 415-a (5) (a) and New York City Charter § 436 as a refusal to carve out an additional exception to long-recognized constitutional principles govern- ing police conduct rather than, as the majority views it, the "extension of additional constitutional protections to those who engage in the vehicle dismantling business". In light of New York's "long tradition of interpreting our State Constitu- tion to protect individual rights" *(People v P. J. Video, supra,* at 303; *see also, People v Harris,* 77 NY2d 434, *supra)*, in light of prior judicial commitment to guarding against dilution, under the guise of administrative regulation, of procedural and other safeguards attendant upon policing conduct of individual citi- zens *(see, e.g., Donovan v Dewey, supra,* at 598, n 6; *See v City of Seattle,* 387 US 541, *supra; People v Burger,* 67 NY2d 338,

*revd* 482 US 691, *supra; cf., People v Pace,* 101 AD2d 336, 340, *affd* 65 NY2d 684, *supra),* and in light of the "independent body of principles" *(People v Torres, supra,* at 228) already carved out in New York "to govern citizen-police encounters" *(People v Torres, supra,* at 228), I agree with the hearing court that Vehicle and Traffic Law § 415-a (5) (a) is invalid under NY Constitution, article I, § 12. I do so because the purpose of the "administrative scheme" at issue here, as the United States Supreme Court *(New York v Burger,* 482 US 691, 702, 703, *supra)* and Officer Baumert implicitly recognized, is to detect already-committed crimes, thereby deterring others, rather than to, e.g., regulate the manner in which the substantive work of the regulated business is conducted *(see, e.g., Donovan v Dewey, supra; cf., See v City of Seattle, supra).* In light of that purpose, traditional rules governing police conduct so as to safeguard individual liberties, including the State constitutional prohibition against unreasonable searches and seizures apply here to invalidate Vehicle and Traffic Law § 415-a (5) (a).

Nor can New York City Charter § 436 be used to legitimize the challenged police conduct. That legislative enactment lacks even the time limitation which was among the factors relied on by the United States Supreme Court in upholding Vehicle and Traffic Law § 415-a (5) (a) on Fourth Amendment grounds *(see, New York v Burger, supra).* Indeed, New York City Charter § 436 specifically authorizes searches and inspections of a variety of "junk" businesses *(cf., Marshall v Barlow's, Inc.,* 436 US 307, *supra)* and those inspections may take place in conjunction with the performance of "any police duties" *(People v Burger, supra,* at 344). While I am of the view that New York City Charter § 436 could not presently withstand even Fourth Amendment scrutiny *(cf., People v Burger, supra),* that scrutiny need not be undertaken here because "resort to the State Constitution * * * is particularly apt when the result under Federal law is uncertain" *(Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57, 66). And broad inspections in connection with the performance of "any" police duty do not pass State constitutional muster (NY Const, art I, § 12).

Because in my view the "inspection" of the defendant's premises was not authorized by a constitutionally valid legislative enactment, the search warrant premised on information thereby obtained and which was sought so that a search for additional automobile parts could be made is also invalid *(see,*

*People v Pace,* 101 AD2d 336, 341, *affd* 65 NY2d 684, *supra).* Moreover, the defendant's statements to the police are the fruit of the unlawful arrest *(see, Dunaway v New York,* 442 US 200). I am of the opinion that Supreme Court, Queens County, thus properly suppressed tangible evidence and statements unlawfully acquired and I would affirm its determination.

MANGANO, P. J., and MILLER, J., concur with KOOPER, J.; HARWOOD, J., dissents in a separate opinion in which BROWN, J., concurs.

Ordered that the order is reversed, on the law, the branch of the defendant's omnibus motion which was to suppress physical evidence and statements made by him to law enforcement officials is denied, and the matter is remitted to the Supreme Court, Queens County, for further proceedings consistent herewith.