Kaye, J.
(concurring). I concur in the result and in the writing of Judge Hancock in Scott and Judge Titone in Keta. In both cases, I agree that, under the State Constitution, defendants’ reasonable expectation of privacy — not some new privacy right, but the privacy right encompassed within the guarantee against unreasonable searches and seizures, as that guarantee is uniformly defined* — has been transgressed. *503 Moreover, I am satisfied that the grounds recited in both writings for the Court’s conclusions are fully in accord with the law and our own precedents.
I write separately only to respond to the broader statements and implications of the dissent about State constitutional law, and especially about us.
I.
Perhaps more than any other issue, the State constitutional law cases over the past decade have seemed to fracture the Court. On a Court where more often than not there is consensus, in State constitutional law cases — civil as well as criminal —we have been uncommonly divided (see, e.g., People v Harris, 77 NY2d 434; People v Dunn, 77 NY2d 19; People v Vilardi, 76 NY2d 67; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57; People v P. J. Video, 68 NY2d 296; SHAD Alliance v Smith Haven Mall, 66 NY2d 496; People v Johnson, 66 NY2d 398; People v Class, 63 NY2d 491). A recent decision evoked four separate writings (Immuno AG. v Moor-Jankowski, 77 NY2d 235). Whether this is a consequence of the "new” judicial federalism and a process of hammering out approaches and methodologies to accommodate it, or the consequence of other factors, is a subject for fuller discourse elsewhere.
What is pertinent to the present case, and significant, is that at least four Judges (not always the same four) in these cases invariably have perceived something distinctive about New York State, or about the particular case, that called upon the Court to differ from the United States Supreme Court. The concurrences and dissents in these cases invariably have contended that there was no unique New York interest warranting greater protection than that afforded by the Supreme Court under the Federal Constitution.
The dissent in this case is distinctive only in the tone of its expression, most especially its accusation that the Court’s legal conclusions and analysis are the product of ideology, simply the imposition of a personally preferred view of the constitutional universe. Without engaging those baseless *504 charges directly, I would add two general observations to those of Judges Titone and Hancock.
First, however much we might consider ourselves dispensing justice strictly according to formula, at some point the decisions we make must come down to judgments as to whether a particular protection is adequate or sufficient, even as to whether constitutional protections we have enjoyed in this State have in fact been diluted by subsequent decisions of a more recent Supreme Court. In that no two cases are identical, it is in the nature of our process that in the end a judgment must be made as to the application of existing precedents to new facts. To some extent that has taken place in the two cases before us — in our reading of Reynolds, Oliver, Burger and other precedents — as in cases that have divided us previously. We may disagree in our application of precedents, but our considered judgment hardly justifies attack for lack of principle, or for overthrowing stare decisis.
Second, I disagree with the dissent that, in an evolving field of constitutional rights, a methodology must stand as an ironclad checklist to be rigidly applied on pain of being accused of lack of principle or lack of adherence to stare decisis. We must of course be faithful to our precedents, as I believe we are in the cases now before us. But where we conclude that the Supreme Court has changed course and diluted constitutional principles, I cannot agree that we act improperly in discharging our responsibility to support the State Constitution when we examine whether we should follow along as a matter of State law — wherever that may fall on the checklist.
II.
Despite a reference to independent State constitutional interpretation, the dissent is laced throughout with a sense of discomfort, even impropriety, about the exercise when it involves rejecting United States Supreme Court decisions. The writing, for example, taunts that this Court is declaring independence from the Supreme Law of the Land, cutting its own constitutional path, propelling itself into a kind of Articles of Confederation time warp, declaring New York-style separatism, creating its own constitutional universe, and on and on.
A State court decision that rejects Supreme Court precedent, and opts for greater safeguards as a matter of State law, *505 does indeed establish higher constitutional standards locally. But that is a perfectly respectable and legitimate thing to do, and does not in any sense signal a return to the Articles of Confederation. Moreover, with the Federal Bill of Rights having been drawn from State constitutional antecedents, there is naturally some equivalency between charters, but no less reason for courts to enforce the respective constitutional guarantees.
Time and again in recent years, the Supreme Court as well as its individual Justices have reminded State courts not merely of their right but also of their responsibility to interpret their own Constitutions, and where in the State courts’ view those provisions afford greater safeguards than the Supreme Court would find, to make plain the State decisional ground so as to avoid unnecessary Supreme Court review.
The Supreme Court is not insulted when we do so. As Justice White wrote in rejecting the contention that an individual’s expectation of privacy was violated as a matter of Federal law by a search of discarded trash: "Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution.” (California v Greenwood, 486 US 35, 43.) In admonishing the Massachusetts court for "unwisely and unnecessarily” inviting Supreme Court review by failing to make clear whether the decision rested on State grounds, Justice Stevens in his Massachusetts v Upton concurrence (466 US 727, 737) — another search and seizure case — restated a fundamental premise of our constitutional system of government, that the States in our Federal system "remain the primary guardian of the liberty of the people” (id., at 739; see also, Michigan v Long, 463 US 1032; PruneYard Shopping Center v Robins, 447 US 74, 81; Oregon v Hass, 420 US 714, 719; Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489 [1977]).
The dissent errs in its suggestion that rejecting Supreme Court precedents somehow disdains the Supreme Court. That suggestion shortchanges both the role of the Supreme Court in setting minimal standards that bind courts throughout the Nation, and the role of the State courts in upholding their own Constitutions.
Dual sovereignty has in fact proved itself not a weakness but a strength of our system of government. States, for example, by recognizing greater safeguards as a matter of State law *506 can serve as "laboratories” for national law (New State Ice Co. v Liebmann, 285 US 262, 311 [Brandeis, J., dissenting]), as was evidenced in the recent overruling of Swain v Alabama (380 US 202) and the new nationwide prohibition of racially discriminatory peremptory challenges (Batson v Kentucky, 476 US 79). When State courts openly rejected Swain as unsound and intolerable, they were neither unduly denigrating nor disdainful of the Supreme Court, but instead discharging their responsibility both to State law and to Federal law.
In those instances where we have gone beyond Supreme Court interpretations of Federal constitutional requirements, our objective has been the protection of fundamental rights, consistent with our Constitution, our precedents and own best human judgments in applying them.
Bellacosa, J. (dissenting).
I.
In these two cases, the Court[1] cuts its own constitutional path through a commercial marihuana farm nestled in 165 acres of idyllic "open fields” in Chenango County, New York State, to the open yard of an alleged "chop shop”, an urban auto dismantling business, in Maspeth, Queens County, New York City. The Court’s declaration of independence from the Supreme Law of the Land (Oliver v United States, 466 US 170; New York v Burger, 482 US 691) and from this Court’s own recent noninterpretative constitutional analysis and definitive guidance (People v Harris, 77 NY2d 434; People v Reynolds, 71 NY2d 552) propels the Court across a jurisprudential Rubicon into a kind of Articles of Confederation time warp. The "movement” has been dubbed the "New Federalism” (Gardner, The Failed Discourse of State Constitutionalism, 90 Mich L Rev 761, 762).
This Court’s metaphorical journey is marked by the Court:
• Supplanting its own noninterpretative method of constitutional analysis;
• Transforming the essential nature of the constitutional protection against unreasonable searches and seizures;
• Substituting privacy as an abstract desidera *507 turn instead of considering the nature and new, sweeping scope of the expectation of privacy interest conferred within its proper contextual criminal jurisprudence framework;
• Rejecting uniformity of Federal and State law in appropriate areas such as are at issue here;
• Discarding the United States Supreme Court’s guidance in the two categories of law involved; and
• Undermining stare decisis by pulling the analytical props out from under several of this Court’s guiding precedents.
The identical constitutional texts at issue in both cases prohibit "unreasonable searches and seizures” (US Const 4th Amend; NY Const, art I, § 12). Simply stated, the common issue is whether this Court has a justifiable basis, within its recently rearticulated method of noninterpretative analysis, to apply New York’s mirror equivalent of the Fourth Amendment prohibition against unreasonable searches and seizures differently from the United States Supreme Court in these cases. The Court severs the expectation of privacy attribute from its essential unreasonable searches and seizures mooring, and invests both cases in the alluring cloak of a generalized privacy interest, as a matter of unique New York concern. In these cases, therefore, we must respectfully dissent and would affirm the orders of the Appellate Division, because no appropriate basis, unique to New York, has been advanced warranting this double-barrelled declaration of peculiar New York-style separatism, bestowing enhanced New York privacy rights on an open fields commercial marihuana grower and on a commercially regulated auto dismantler.
II.
In People v Scott, a private citizen, who was bow hunting, wounded a deer and tracked it onto defendant’s property. He chanced upon defendant’s marihuana farm, carefully tilled within 165 acres of otherwise undeveloped fields, hills and woodlands in Chenango County. The 200 portable marihuana plants were set in burlap pots, with a sophisticated irrigation system, and were camouflaged with netting to obscure aerial observation. The hunter observed the marihuana farm and an armed guard at the site on a subsequent occasion. Months later, the citizen reported the criminal activity to lawful authorities and thereafter reentered the property at the re *508 quest of and accompanied by a law enforcement officer. They were chased off with shouted curses by an unidentified, armed individual. A search of land records disclosed that defendant Scott owned the land, which he had posted with "No Trespassing” signs also containing his name. Despite the Court’s repeated references, the record contains no support that defendant Scott had erected any fences on this large track of land, or that the drugs were being grown near any home, building or curtilage. Later, a judicial warrant was obtained and executed. Scott was eventually arrested and this prosecution ensued. The lower courts denied suppression of the evidence and, after a plea of guilty for criminal possession of marihuana in the first degree, the conviction was appealed and upheld by a unanimous Appellate Division, Third Department (169 AD2d 1023). Disregarding the United States Supreme Court ruling in Oliver v United States (466 US 170, supra), and this Court’s rulings in People v Harris (77 NY2d 434, supra) and People v Reynolds (71 NY2d 552, supra), the Court now suppresses the evidence as obtained in violation of New York Constitution, article I, § 12.
In People v Keta, during regular business hours (3:30 p.m.), police officers from the City’s Auto Crimes Division randomly selected a Maspeth, Queens, vehicle dismantler ("Jimmy & Son Auto Dismantlers”) for a routine administrative inspection. It was among others they visited that day. They asked the proprietor to produce the required operating permits and business license (see, Vehicle and Traffic Law § 415-a [5] [a]). The officers also asked to see some auto parts and immediately verified — using portable computers to access stolen car records —that some of the parts were from stolen vehicles. The officers then asked to see the record book, which the statute requires all licensed operators in the auto dismantling business to maintain. Upon discovering that the stolen parts had not been entered in the record book, the officers conducted a further administrative inspection of the premises, including an open yard. They discovered 35 stolen auto parts. At 5:30 p.m., officers were dispatched to apply for a judicial search warrant. The officers returned at 8:00 p.m. with a warrant, and a complete search and seizure were ultimately effected pursuant to that warrant. That led to the indictment on multiple counts of criminal possession of stolen property in the third degree of the alleged "chop shop” owner, defendant Keta. Supreme Court suppressed the evidence (142 Misc 2d 986) and the Appellate Division, Second Department, in a *509 cogent opinion which faithfully analyzed and applied this Court’s governing precedents, reversed, denied suppression and reinstated the criminal charges (165 AD2d 172). This Court now nevertheless reverses and suppresses the evidence and declares Vehicle and Traffic Law § 415-a (5) (a) unconstitutional on newly discovered generic State "privacy” grounds. It is important to note that no State constitutional grounds, and especially no generalized "privacy” attributes, were used or asserted in this Court’s decision in People v Burger (67 NY2d 338). The United States Supreme Court, it must be recalled, had previously reversed this Court, finding the same Vehicle and Traffic Law statute constitutional (New York v Burger, 482 US 691, revg 67 NY2d 338, supra).
III.
With respect to the particular subject matter of these cases, the United States Supreme Court has definitively ruled that there is no Fourth Amendment unreasonable search and seizure protection or violation (Oliver v United States, 466 US 170, supra; New York v Burger, 482 US 691, supra).
Analysis starts by recognizing that the Search and Seizure Clauses of the two Constitutions are identical.[2] Indeed, the evidence suggests that the modern State provision, first inserted in our Constitution in 1938, was derived from the Fourth Amendment of the United States Constitution (see, People v P. J. Video, 68 NY2d 296, 304, n 4; People v Johnson, 66 NY2d 398, 405-407). Because the language of the two clauses is identical, "it may be assumed” they confer similar rights (People v Harris, 77 NY2d 434, 437, supra; People v Johnson, supra, at 406-407). Thus, when interpreting our State Constitution, there should be "[sufficient reasons”, we have said, for disagreeing before we construe the State provision in a manner different from the construction placed on its Federal counterpart by the United States Supreme Court (see, People v Harris, 77 NY2d 434, 437, supra).
"Sufficient reasons” for disagreeing with the Supreme Court *510 may be found in "'preexisting State statutory or common law defining the scope of the individual right in question [ — prohibition against "unreasonable searches and seizures”]; the history and traditions of the State in its protection of the individuad right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right’ ” (People v Harris, 77 NY2d 434, 438, supra [emphasis added], quoting People v P. J. Video, 68 NY2d 296, 303, supra). To these factors we have added "the practical considerations of the need for Federal-State uniformity, and the sometimes countervailing necessity of a 'bright line’ test” in search and seizure cases (People v Alvarez, 70 NY2d 375, 379). When making the analysis, courts unquestionably require something more than mere ideological disagreement, among members of a State court, with the definitive decisions of the highest Court in the land (see, People v Vilardi, 76 NY2d 67, 80 [Simons, J., concurring]).
In People v Harris (77 NY2d 434, supra), for example, on remand after reversal by the United States Supreme Court, this Court linked its independent State constitutional search and seizure interpretation to New York’s "unique”, " 'cherished principle’, rooted in this State’s prerevolutionary constitutional law and developed 'independent of its Federal counterpart’ ”, under which "protection of the right to counsel has become a matter of singular concern in New York” (id., at 439; contrast, Immuno AG. v Moor-Jankowski, 77 NY2d 235, 249-250).
The Court today has not articulated "sufficient reasons” under this noninterpretative analysis warranting a departure from the United States Supreme Court’s decisions. The test, as the Court now frames it, is not to be found in any settled method of analysis adopted in our prior decisions, but in this Court’s new, conclusory view that the United States Supreme Court’s rulings do "not adequately protect fundamental constitutional rights” (People v Scott, majority opn, at 478, 486), or do not "assure that our State’s citizens are adequately protected from unreasonable governmental intrusions” (People v Keta, majority opn, at 497). No analytical standard for deciding and choosing among important Constitutional rights is provided, and the expectation of privacy element of the unreasonable searches and seizures protection is entirely lost or subsumed within a generalized right to privacy (see, infra, at 513-514). In *511 stead, the Court tries to shift its burden of identifying the "unique” predicate under the noninterpretative analysis to us in dissent, charging that we have not been "clear” in our meaning (People v Scott, majority opn, at 490). The Court seems to not comprehend what we are objecting to, which is that there must be some disciplined analytical method to provide precedential guidance and to justify the desired outcome by reasoned articulation. We most assuredly do not object to the conferral of State constitutional rights to individuals. The Court repeatedly misstates this key difference. Our view, as contrasted to its characterization by the Court, is not rigid or lockstepped and is premised on traditional, well-settled and well-respected judicial analysis and rubrics. The brief response to the tonal accusations of the concurring opinion is that we have discussed the issues with direct language because the principles and consequences are profound.
The Court’s justification centers on the analyses of United States Supreme Court decisions, from which the Court discerns unevenness (see, People v Scott, majority opn, at 481-485; People v Keta, majority opn, at 493-495). It rejects the United States Supreme Court rulings because in this Court’s view there is "uncertainty” and "inconsistency” in that Court (People v Scott, majority opn, at 482, 483) and because the history of the administrative search cases in that Court has been "perplexing” (People v Keta, majority opn, at 494). The characterizations are surely debatable and of scant significance because the Oliver and Burger decisions do not conflict with preexisting settled New York law. Indeed, the only prior New York cases addressing the subjects at issue were consistent with the United States Supreme Court’s rulings in Oliver (see, People v Reynolds, 71 NY2d 552, supra) and in Burger (see, Matter of Glenwood TV v Ratner, 65 NY2d 642, affg on opn at App Div 103 AD2d 322 [Titone, J. P.]). Thus, this Court’s ground for departure from United States Supreme Court rulings is unfounded (contrast, People v Vilardi, 76 NY2d 67, 75, supra; People v Griminger, 71 NY2d 635; People v P. J. Video, 68 NY2d 296, 305, supra; and People v Johnson, 66 NY2d 398, 406-407, supra; see, People v Belton, 55 NY2d 49). Moreover, it is the direct impact of the United States Supreme Court’s rulings on New York law that should be significant, not this Court’s historical reprises of the United States Supreme Court’s own articulations on the particular subject. Inasmuch as the Oliver and Burger decisions do not unsettle prior New York law, the United States Supreme Court rulings should be *512 given greater respect in the absence of a "unique” New York "cherished principle” for dispatching them (People v Harris, 77 NY2d 434, 439, supra).
The Court’s failure to apply its own noninterpretative analysis creates a sweeping precedential change and a long-term guidance vacuum (see, People v Alvarez, 70 NY2d 375, 379, supra; People v Johnson, 66 NY2d 398, 406, supra; People v Ponder, 54 NY2d 160, 165). Johnson certainly does not stand for anything like the role the three opinions of the Court have variously assigned to it, and P. J. Video and Harris did not open up the analytical process and choices to the extremes illustrated by the holdings today. Nor is the new approach supported by the litany of New York cases relied upon by the Court, especially in Scott. Instead, a parade of readily distinguishable cases are relied on, along with selective secondary authorities and dissenting opinions. Most of the cases cited in Scott are not even noninterpretative analysis cases, and the opinion avoids the pointedly relevant cases this dissent cites and which we believe are directly applicable. The breadth of the Court’s rationale is further illustrated by the importation of whole portions of New York’s Penal Law, the Environmental Conservation Law and the General Obligations Law. This technique will necessarily allow and even induce uneven, selective importation of many other provisions of New York’s Penal Law, plus importation of hundreds of volumes of the other substantive Consolidated Laws. This approach wholly swallows the noninterpretative analytical principle and substitutes a vacuum of guidance to the lower courts in place of the useful and proper guidance that was available.
In Scott, moreover, the Court relies on the law of trespass— common to the law of every State and rooted in Anglo-American values as ancient as the genesis of the common law itself (see, 3 Blackstone, Commentaries on the Laws of England, ch XII [1768]). That, self-evidently, cannot constitute a "unique” New York interest.
In similar style, the Court in Keta diverts the proper focus by expressing concern that the colonial "writs of assistance” will be reinstituted and that our dissenting view of this case violates some constitutional privacy birthright of auto dismantling businesses (majority opn, at 497, 501). However, Keta simply involves legitimate and statutorily authorized administrative regulation with reasonable allowance for investigative and prosecutorial follow-ups. Yet, Keta rules that enterprises en *513 gaged in the dismemberment of hundreds of thousands of stolen vehicles in the State and City of New York were not targeted by the Legislature for intense regulation by a proper statutory regime. This premise then launches a more sweeping jurisprudential holding: that the records and inventories of these 170 registered and licensed enterprises in New York City should be granted "unique New York privacy” protections because they represent a modern, compelling, exceptional local concern. The Court thus, in effect, purports to overrule the United States Supreme Court’s pointed reversal of this Court’s decision in New York v Burger (482 US 691, supra) involving the same statute, Vehicle and Traffic Law § 415-a.
The failure of the Court to properly apply and follow noninterpretative analysis connotes either a sub silentio overruling of the cases that require it (see, People v Harris, 77 NY2d 434, supra; People v Reynolds, 71 NY2d 552, supra; People v P. J. Video, 68 NY2d 296, supra; People v Johnson, 66 NY2d 398, supra) — an undermining of stare decisis — or the adoption of a new, unique, New York ground, i.e., a pervasive, all-encompassing privacy essence, as contrasted with the traditional expectation of privacy attribute of the unreasonable searches and seizures protection in criminal jurisprudence.
This limitless shift in essential focus away from disciplined analysis of the particular "individual right in question” (People v Harris, 77 NY2d 434, 438, supra) into a nonspecific, uncharted constitutional privacy ground is effected in Scott with an ode to individuality based on New York’s devotedness to the "unconventional”, "bizarre” and even to the "offensive” (People v Scott, majority opn, at 488). The Court, in effect, creates a new echelon of State constitutional analysis which may be deployed whenever any future majority of this Court simply chooses to differ with a particular United States Supreme Court decision and interpretation (see, Simpson v Loehmann, 21 NY2d 305, 314 [Breitel, J., concurring]; see also, People v Disbrow, 16 Cal 3d 101, 119, 127 Cal Rptr 360, 372, 545 P2d 272, 284 [Richardson, J., dissenting]; Gardner, The Failed Discourse of State Constitutionalism, op. cit., at 814-822).
IV.
Privacy is, without question, an important constitutional and societal value. However, the nature and scope of the *514 privacy attribute at issue, and the persons or entities entitled or intended to be within the ambit of the new New York protection, should be analyzed in the concrete application and consequences of these peculiar cases. These are not, as the Court boldly proclaims, cases dealing with a general right to privacy and a concomitant right to be left alone (People v Scott, majority opn, at 486-487). Rather, these Fourth Amendment cases should be analyzed in their proper analytical framework, namely, the reasonable, legitimate, cognizable expectation of privacy in a traditional criminal jurisprudence context. The Court has failed to analyze the privacy right in this proper setting, and that is one of our principal differences with the Court’s approach.
In Scott, the Court indicates that the issue does not pertain to the wording or history of the Fourth Amendment or of article I, § 12; rather, it is about New York’s fundamental privacy rights. That opinion concludes that the issue is "whether we should adopt the [Supreme] Court’s * * * categorical holding that an expectation of privacy in land outside the curtilage (manifested by posting or erecting fences) is not one which society is prepared to recognize as reasonable” (majority opn, at 486 [emphasis in original]). Indeed, the Court ignores the essential search and seizure nature of the case by asserting that the Court here should be guided by cases involving the bundle of property rights preserved for single-room occupancy building owners (Seawall Assocs. v City of New York, 74 NY2d 92), conjugal rights for prison inmates suffering from AIDS (Matter of Doe v Coughlin, 71 NY2d 48), and consensual sodomy in an automobile on a city street (People v Onofre, 51 NY2d 476).
In Keta, the Court likewise ignores the precise constitutional guarantee, which prohibits unreasonable searches and seizures, by framing the issue as "whether an inspection conducted pursuant to Vehicle and Traffic Law § 415-a (5) (a) violates the privacy rights encompassed within article I, § 12 of the New York State Constitution” (majority opn, at 495 [emphasis added]).
These seductively framed issue statements disguise the analytically flawed product within. In another sense, they actually expose the fundamental error. What emerges is an amorphous and all-encompassing "privacy right” that has metamorphosed into the new "individual right in question”, in substitution of the unreasonable searches and seizures clause *515 truly at issue (People v Harris, 77 NY2d 434, 438, supra, quoting People v P. J. Video, 68 NY2d 296, 303, supra).
Moreover, the Court disdains uniformity in constitutional adjudication as though it reflects only stubborn rigidity on our part. By its rhetorical device, uniformity is sacrificed along with selectively disfavored United States Supreme Court rulings. However, uniformity endures as an important policy ingredient in constitutional analysis, and serves practical purposes as well, especially in cases marked by joint Federal and State cooperative law enforcement efforts. No better illustrations could be imagined than those present in these two cases: major drug cultivation (Scott), and alleged massive theft on a commercial, entrepreneurial level (Keta). The calamitous consequences in economics and crimes which will be visited on New York because of the Court’s indifference to the jurisprudential and practical benefits of Federal and State uniformity, and the countervailing necessity of some "bright line” guidance in this area of the law (People v Alvarez, 70 NY2d 375, 379, supra; see, People v Ponder, 54 NY2d 160), should be intuitively obvious. Instead, the decisions in these two cases will inevitably now sow confusion in understanding the law and division in the execution of responsible administrative, investigative and prosecutorial responsibilities.
In Scott, for example, had the hunter called the FBI instead of the local Sheriff, and had the case been prosecuted in Federal court instead of State court, the major criminal drug harvester would not be set free to resume the illicit drug enterprise. Indeed, if the State police had "silver-plattered” the information to Federal officials for their use, then the evidence would likely not have been suppressed.
In Keta, if State fiscal and personnel resources had allowed Department of Motor Vehicles administrative agents to conduct the initial random inspection, and had they then notified criminal law enforcement authorities of the theft findings, perhaps there would be a different result in this case and the statute might not be declared unconstitutional. The Court’s constitutional impediment seems to stem principally from the conclusion that the police are somehow disqualified from initially performing the statutorily regulated inspection function. Such distinctions are artificial and demonstrate the unsoundness of the profound legal consequences wrought by the Court in these cases.
*516 V.
In addition to the analytical and procedural failings, another important defect emerges. To be sure, the Court in Reynolds (71 NY2d 552, supra) refrained from presuming to decide more than was before it, leaving the posting-of-open-fields issue for another day. Yet, in Reynolds, this Court (1) upheld an aerial search of an "open fields” drug enterprise, in consonance with the principles of Oliver v United States (466 US 170, supra); (2) expressly declined to adopt new State constitutional protections in that case and in this search and seizure area; (3) emphasized the identity of purpose of the identical Search and Seizure Clauses in both Constitutions (People v Reynolds, 71 NY2d 552, 557, supra); (4) adhered to the important jurisprudential policy of uniformity of interpretation of identical Federal and State constitutional provisions such as the Search and Seizure Clauses involved in these cases (id.); and (5) rejected the expansive notions of the dissent in that very case. Yet, the Court in Scott now revives the dissent in Reynolds and infers that it is institutionally free to discard those key features of the Reynolds’ ratio decidendi. It thus weakens the important value of institutional stability and continuity of this Court’s decisions, which is supposed to be unaffected by "the accident of a change in its [the Court’s] composition” (see, Simpson v Loehmann, 21 NY2d 305, 314, supra [Breitel, J., concurring]).
VI.
The Legislature has determined that the auto dismantling industry needs close administrative supervision and regulation. This is undisputed and understandable. The legislative memorandum filed in support of Vehicle and Traffic Law § 415-a (5) (a) clearly reflects the objective underlying the statute: "to provide a system of record keeping so that vehicles can be traced through junk yards and to assure that such junk yards are run by legitimate businesses] rather than by auto theft rings” (1973 NY Legis Ann, at 287, 288). A 1978 Senate Report describes New York’s auto theft rate as having reached “horrendous proportions”, creating "a low risk, high profit multimillion dollar industry” (Auto Thefts: A Low Risk High Profit Crisis in New York State, Report of NY St Senate Comm on Transp [1978]). The report adds that the New York metropolitan area — in particular — has been targeted by professional auto rings (id.). Indeed, in approving certain amend- *517 merits to this administrative scheme in 1979, then-Governor Carey observed that motor vehicle theft has resulted in "an intolerable economic burden on the citizens of New York” (Governor’s Approval Mem, 1979 NY Legis Ann, at 416 [emphasis added]). The statistics are revealing. New York ranks first in the per capita vehicle theft rate, with 1,042 thefts per 100,000 people. Auto theft was the fastest growing crime in New York from 1986 through 1990, leaping at an astounding 65.4% rate, far ahead of the second fastest growing crime— homicide (Crime and Justice Trends in New York State: 1986-1990, NY St Div of Grim Just Servs, Off of Just Sys Analysis Bull, Sept. 1991). Yet, the Court overturns the Legislature’s enactment of a present remedy to control and to regulate this economic debacle, Vehicle and Traffic Law § 415-a — an enactment entitled to the presumption of constitutionality.
Most other Legislatures have also judged it necessary to adopt similar statutes permitting warrantless inspections of the records and inventories of vehicle dismantlers and automobile junkyards (see, New York v Burger, 482 US 691, 698, n 11, supra). The Court today points to no history or tradition of this State creating a peculiar State or local concern warranting extra New York privacy protections to such commercial operations, or that vehicle dismantlers in New York have historically expected or been accorded greater protection than that afforded by the United States Supreme Court in New York v Burger (supra) to the rest of the Nation.
In fact, the opposite is true. There can be no question that vehicle dismantling businesses, like junkyards, are "closely regulated” businesses in this State, and that inspections and searches made pursuant to Vehicle and Traffic Law § 415-a (5) clearly fall within the well-established exception identified in New York v Burger (482 US 691, 703-707, supra; see, Matter of Glenwood TV v Ratner, 103 AD2d 322 [Titone, J. P], affd on opn at App Div 65 NY2d 642, supra). That exception is obliterated by this case. The pervasiveness of the auto theft crisis, the legislative history, the carefully prescribed nature and specifics of the administrative regime adopted, and the history of close governmental oversight of this and related crime-plagued industries support the eminently reasonable conclusion that the operators of these commercial establishments possess a greatly reduced expectation of privacy, especially during regular business hours (see, Donovan v Dewey, 452 US 594; Marshall v Barlow’s, Inc., 436 US 307; United States v Biswell, 406 US 311; Colonnade Corp. v United States, *518 397 US 72). This factor is thoroughly ignored and, indeed, inverted by the Court. /
These auto dismantling business yards and the open fields of this vast State plainly do not fit under the proverbial "homes are our castles” mantle, a metaphor that has rightly gained cachet only in its proper application, under the Fourth Amendment and under New York’s constitutional equivalent, article I, § 12.
VII.
The doctrine that State courts should interpret their own State Constitutions, where appropriate, to supplement rights guaranteed by the Federal Constitution is not in dispute. Indeed, we have shown our support for that doctrine where appropriate with our votes in a long line of cases (see, e.g., Immuno AG. v Moor-Jankowski, 77 NY2d 235, supra; People v Van Pelt, 76 NY2d 156). Thus, the Court’s accusation of our "distress” with the general proposition is puzzling (People v Scott, majority opn, at 490). We do strenuously disagree with the Court, however, that the doctrine is being "cautiously exercised” (People v Reynolds, 71 NY2d 552, 557, supra) and believe that the applications of the doctrine here create a sweeping, new and unsettling interpretation — not mere application of settled principles.
Moreover, we are concerned that, inasmuch as the Supremacy Clause of the United States Constitution does not apply in these cases, and inasmuch as this Court’s self-imposed noninterpretative analysis has now been effectively scuttled by these two cases, New York’s adjudicative process is left bereft of any external or internal doctrinal disciplines (see, US Const, art VI, |J 2; People v Harris, 77 NY2d 434, supra). It is that vacuum which we abhor and with which we disagree, respectfully and unabashedly.
After the many words of all the opinions, these two cases reduce to a fairly simple proposition. The common constitutional text and provision at issue in each case is a prohibition against "unreasonable searches and seizures”, in which is embedded the attribute of a reasonable expectation of privacy. The United States Supreme Court in recent cases and the Appellate Division in the very cases under review have held definitively that the careful, deliberative police conduct in each case was reasonable. It is not reasonable, therefore, for this Court in these circumstances and on these bases to *519 superimpose its preferred view of the constitutional universe. The Court has elevated subjective expectations of privacy to sovereign status by judicial fiat, thus reducing law to a State of mind rather than a set of reasonable, universal norms. The Court’s method alters the words and analysis from the long-prevailing legitimate and reasonable expectations of freedom from unreasonable searches and seizures to purely subjective expectations of privacy. This supervening transformation is, in our view, unsupportable under this Court’s own precedents and policies.
In People v Scott: Order reversed, guilty plea vacated, defendant’s motion to suppress granted and indictment dismissed.
Judges Kaye, Alexander and Titone concur with Judge Hancock, Jr.; Judge Kaye concurs in a separate opinion in which Judges Alexander, Titone and Hancock, Jr., also concur; Judge Bellacosa dissents and votes to affirm in another opinion in which Chief Judge Wachtler and Judge Simons concur.
In People v Keta: Order reversed and case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.
Judges Kaye, Alexander and Hancock, Jr., concur with Judge Titone; Judge Kaye concurs in a separate opinion in which Judges Alexander, Titone and Hancock, Jr., also concur; Judge Bellacosa dissents and votes to affirm in another opinion in which Chief Judge Wachtler and Judge Simons concur.

 Though not expressed in our Federal or State Constitutions, the protection of an individual’s reasonable expectation of privacy has consistently been recognized as the core of the constitutional guarantee against unreasonable searches and seizures (see, e.g., Matter of Caruso v Ward, 72 NY2d 432, 437 [search and seizure analysis rests directly on the uniquely private nature of the act and the individual’s privacy right]; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 66 [article I, § 12 of State Constitution and Fourth Amendment designed to protect the personal privacy and dignity of individual against unwarranted State interference]; People v Rodriguez, 69 NY2d 159, 162 [privacy nature of interests protected by Fourth Amendment]; People v John BB., 56 NY2d 482, 486 *503 [State and Federal proscription against unreasonable seizure generally forbids unwarranted intrusion into private affairs]; Mapp v Ohio, 367 US 643, 655, 656 [Fourth Amendment’s right of privacy no less important than any other right carefully and particularly reserved to the People]).

. For convenience, "the Court” collectively refers to the three opinions aggregating the same majority in each case, except where necessary to refer to a specific opinion.

. The Court makes a diverting reference to New York’s electronic eavesdrop protection (People v Scott, majority opn, at 486) that has nothing at all to do with these cases and appears to be suggesting, for the first time by anyone, that an interpretative constitutional method of analysis might be applicable. Moreover, the allusions to the brilliant and oft-quoted aphorism from Olmstead v United States (277 US 438, 485) by Justice Brandéis in dissent are likewise curious in the analytical framework and factual patterns of these two cases. (Majority opn, at 486-487.)